[L.A. No. 31828. Aug. 27, 1984.]

HARRY CARIAN, Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

[L.A. No. 31829. Aug. 27, 1984.]

RICHARD PETERS FARMS, Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

## COUNSEL

David E. Smith and James W. Hall for Petitioners.

Dennis M. Sullivan, Marvin J. Brenner, Thomas M. Sobel, Ellen Lake, Manuel M. Medeiros and Daniel G. Stone for Respondent.

Marco E. Lopez, Carlos M. Alcala, Francis E. Fernandez, Carmen C. Flores, Dianna Lyons, Jerome Cohen, William H. Carder, Ellen Greenstone, Tom Dalzell, Sanford N. Nathan, Kirsten L. Zerger, W. Daniel Boone, Michael Heumann, Linton Joaquin, Mary H. Mocine, John Rice-Trujillo, Deborah Wiener, Daniel A. Garcia and Wendy Sones for Real Party in Interest.

## OPINION

**GRODIN, J.**—Harry Carian (Carian) and Richard Peters Farms (Peters), both agricultural employers covered by the Agricultural Labor Relations Act (ALRA) (Lab. Code, § 1140 et seq.),[1] seek review of decisions by the Agricultural Labor Relations Board (ALRB or board) finding that each of them committed certain unfair labor practices, and ordering remedies therefor. The Court of Appeal for the Fourth District granted their respective petitions for review, and in both cases reversed in part the board's determinations. We granted hearing in order to consider significant issues common to both proceedings. The two proceedings have been consolidated for purposes of argument and decision.

---

[1] All statutory references are to the Labor Code unless otherwise indicated.

One issue presented is whether it is within the authority of the board to promulgate a regulation requiring that an employer, upon being served by a labor organization with notice of its intention to organize the employer's employees, must furnish a list of the employees' names, current street addresses, and job classifications—in the board's terminology a "prepetition list." We shall hold, in accordance with our prior decision in *Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392 [128 Cal.Rptr. 183, 546 P.2d 687], that such a regulation is well within the board's statutory grant of authority to promulgate "such rules and regulations as may be necessary to carry out [the provisions]" of the ALRA (§ 1144).

A second issue is whether it is necessary to demonstrate the actual effect of an employer's conduct upon identifiable employees in order to establish a violation of section 1153, subdivision (a). That statutory provision makes it an unfair labor practice for an employer to "interfere with, restrain, or coerce" employees in the exercise of their rights under the ALRA. We shall hold, in accordance with well-established precedent under the National Labor Relations Act (NLRA) (29 U.S.C. § 151 et seq.), that proof of particularized effect is not required, and that a violation of section 1153, subdivision (a), can be found in conduct which, in the reasonable estimation of the board, is likely to interfere with the free exercise of employee rights under the statute. Applying that principle to the circumstances of this case, we shall hold that the board was justified in finding that the two employers violated section 1153, subdivision (a), when they failed to provide a prepetition list as required by the board's regulation, and when they engaged in a practice of soliciting information from employees by means which the board reasonably regarded as a form of unlawful interrogation. We shall also uphold the remedies which the board ordered for these violations.

## FACTS

Appellants Carian and Peters both are agricultural employers primarily growing table grapes in Riverside County. Carian employs approximately 400 employees for harvesting once or twice a year, for up to a week on each occasion. Peters' minimal permanent work force is supplemented by an additional 250 or so workers, also essentially to harvest crops, for one or two weeks, usually twice a year. Carian owns and operates three labor camps in which its additional workers are housed. Peters operates one such camp.

On March 28, 1977, agricultural labor organization United Farm Workers of America, AFL-CIO (UFW), served Carian with a notice of its intention to organize Carian's employees. This service triggered the requirements of

California Administrative Code, title 8, sections 20310, subdivision (a)(2)[2] and 20910.[3]

Among these requirements is the command that within five days of being so served, an employer must furnish the ALRB with what has come to be known as a "prepetition employee list." This list must contain, inter alia, "[a] complete and accurate list of the complete and full names, current street addresses, and job classifications of all agricultural employees . . . in the payroll period immediately preceding the filing of the petition."

On April 6, eight days after the notice of intention to organize was served, Carian submitted to the ALRB its first purported attempt to comply with the applicable regulations. Specifically, it supplied the ALRB with a list of 207 employees. This list, however, was deficient in several respects. It specified no payroll period, nor did it set forth job classifications for the employees listed. The addresses of 54 of the employees whose names appeared on the list consisted only of post office box numbers. For 92 other employees, the addresses listed were outside the Coachella Valley, where Carian's vineyards are located. While Carian stipulated at its hearing before an administrative law officer (ALO) that fully one-half of its work force

---

[2]Section 20310, subdivision (a)(2) reads as follows: "(a) Employer's Written Response to the Petition. Upon service and filing of a petition, as set forth above, the employer so served shall provide to the regional director or his or her designated agent, within the time limits set forth in subsection (d), the following information accompanied by a declaration, signed under penalty of perjury, that the information provided is true and correct: . . . (2) A complete and accurate list of the complete and full names, current street addresses, and job classifications of all agricultural employees, including employees hired through a labor contractor, in the bargaining unit sought by the petitioner in the payroll period immediately preceding the filing of the petition. The employee list shall also include the names, current street addresses, and job classifications of persons working for the employer as part of a family or other group for which the name of only one group member appears on the payroll. If the employer contends that the unit sought by the petition is inappropriate, the employer shall additionally, and within the time limits set forth in subsection (d), provide a complete and accurate list of the names and addresses of the employees in the unit the employer contends to be appropriate, together with a written description of that unit. If an employer chooses to submit, in addition to the information required, W-4 forms, social security numbers, employee signature facsimilies, or similar information, the regional director shall use such information to confirm the validity of the union's showing of interest only to the extent he or she deems appropriate in his or her discretion. Such information may also be used by the regional director to the extent he or she deems appropriate in his or her discretion in order to resolve allegations of fraud in the showing of interest pursuant to Section 20300(j)(4) of these regulations."

[3]Section 20910, subdivision (a) reads as follows: "Any labor organization that has filed within the past 30 days a valid notice of intent to take access as provided in Section 20900(e)(1)(B) on a designated employer may file with the appropriate regional office of the Board two (2) copies of a written notice of intention to organize the agricultural employees of the same employer, accompanied by proof of service of the notice upon the employer in the manner set forth in Section 20300(f). The notice must be signed or accompanied by authorization cards signed by at least ten percent (10%) of the current employees of the designated employer."

resided in one of the labor camps owned by their employer, and as a result it would have been a simple matter for Carian to have specified as current "street" addresses the labor camp address for the vast proportion of its employees, the addresses given for only seven employees actually named one of these camps or a street location possibly intended to designate one of the camps.

Both the UFW and the ALRB apprised Carian that its ostensible effort to supply them with the required employee list was inadequate. Apparently in response to these objections, Carian began presenting its employees with "employee information cards." At the top of each card was a statement, printed in boldface type, which said: "The Company must request the following information from each employee under the law of the state of California. This information must be supplied to the Agricultural Labor Relations Board under certain circumstances and may be given by the Agricultural Labor Relations Board to union organizers." Beneath these remarks were spaces reserved for the employee's name, mailing address, current street address, social security number, age (if under 18), and date. Then appeared a space for the employee's signature, above which the following statement was inserted, again in boldface type: "I am not willing to supply any information that I have not written on this card." The card was printed in both English and Spanish.

Carian finally submitted two additional employee lists to the ALRB, one on April 22, the other on May 2. Neither list specified the payroll period to which it pertained. Only one job classification, "general labor," was provided for all listed employees. As for address information, the April 22 list did little to elaborate on the information provided in the inadequate list of April 6. Of the 140 employees listed, 84 were said to have addresses outside Coachella Valley; for 31, only post office boxes had been provided; 3 had no addresses stated at all.

As the ALO found, the May 2 list improved little on the lists that preceded it. This time 207 names were listed. Ninety percent of these (182) were described as having the same addresses as were contained on the list of April 6. This final purported attempt by Carian to comply with the clear directive of the relevant regulations resulted in only two additional "street" addresses being listed.

On comparing the three lists, the ALO found the composition of Carian's work force had changed dramatically during the period over which the lists were prepared. For example, the April 22 list contained 71 new employee names which had not appeared previously. Of course, absent the missing required reference to a specific payroll period, it would have been impos-

sible for the UFW or the ALRB to ascertain whether the presence of the new names indicated a turnover in the work force, or an addition to Carian's employee pool, let alone when any such changes actually occurred.

The facts are similar with respect to Peters, who was and continues to be represented by the same counsel who represents Carian. After being served with a notice of intention to organize by the UFW on February 10, 1977, Peters failed to submit the required employee list within the five-day period mandated by the California Administrative Code. Spurred by charges filed with the ALRB, Peters finally provided a prepetition list nearly three weeks later, on March 1. This list contained 50 employee names, with but 1 employee listed as possessing a Coachella Valley street address. Post office boxes were the only addresses listed for 30 of the employees, while addresses outside the Coachella Valley were provided for 19 others. The list was tendered by Peters' attorney, along with a letter from counsel which contained the statement, "[t]his employee list is being delivered to you on the condition that the charge . . . be withdrawn and no complaint be issued."[4]

Dissatisfied with the paucity of information contained in the March 1 list, the UFW served a second notice of intention to organize on Peters on March 29. On April 4, nearly two months after the union had served its original notice on the employer, Peters' attorney submitted a second employee list. Of the 43 employee names listed, post office boxes were the only addresses supplied for 21 employees. Thirteen employees were listed as having addresses outside the Coachella Valley—these from such far-flung locales as South San Francisco and Jalisco, Mexico. Twenty-seven of the employees listed on the deficient March 1 list were also listed on this most recent submission—yet, if in the interim any attempt had been made to discern their current street addresses, none was apparent, in that once more, post office boxes were all Peters provided.

Peters had also circulated "employee information cards," identical to those later used by petitioner Carian (except for the fact the cards used by Peters were printed exclusively in English). Although, as the ALO pointed out, most of the cards were dated March 30 and March 31—several days before the submission of Peters' "second" employee list—the street address information contained on many of the cards was never transmitted to the UFW.

---

[4]Apparently counsel was under the mistaken impression that the submission of the list might be made conditional, such that a compromise by the board could be forced by an employer before it could be compelled to proffer even the minimal information supplied here.

The UFW filed charges with the ALRB related to the course of conduct described above. As a result, the ALRB's general counsel filed with the board complaints which alleged Carian and Peters, among others,[5] had committed two unfair labor practices in violation of section 1153, subdivision (a): one by failing to supply complete and accurate prepetition employee lists as required by regulations 20910, subdivision (a), and 20310, subdivision (a)(2); the second by unlawfully interrogating employees, through the use of the information cards, as to whether or not they favored unionization in evincing their willingness to be visited in their homes by union organizers. The cases of Carian and Peters, who filed answers denying the allegations charged, were consolidated with those of two other growers who had been charged with similar violations of the California Administrative Code. Separate hearings were noticed and held in each case before an ALO, though only one decision was rendered by the ALO, and by the ALRB. Characterizing the use of the employee information cards as an unlawful "surveillance," the ALO found Carian and Peters both had committed the two unfair labor practices alleged. The ALRB modified this decision only insofar as it recharacterized the use of the cards as an unlawful interrogation. The board then issued a remedial order to enforce its decision.

## I.

We first address petitioners' contentions that the promulgation of the prepetition list regulation was in excess of the board's authority, and not reasonably necessary to the purposes of the statute. As we explained in *Agricultural Labor Relations Bd.* v. *Superior Court, supra,* 16 Cal.3d 392, 411, " 'these issues do not present a matter for the independent judgment of the appellate tribunal; rather, both come to the court freighted with the strong presumption of regularity accorded administrative rules and regulations.' [Citation.] And in considering whether the regulation is 'reasonably necessary' under the foregoing standards, the court will defer to the agency's expertise and will not 'superimpose its own policy judgment upon the agency in the absence of an arbitrary and capricious decision.' [Citation.]" Applying those principles, we find petitioners' contentions without merit.

A requirement that employers furnish lists of names and addresses of employees in order to facilitate communication between them and a labor organization seeking to represent them is hardly novel in the arena of labor relations. A similar requirement has been in effect for nearly 20 years under the NLRA: an employer covered by that act, within seven days of the di-

---

[5]Two other agricultural employers, Laflin and Laflin, and Henry Moreno, were also so charged.

rection of an election or the approval of a consent election agreement, must provide the union with the names and addresses of employees eligible to vote. (*Excelsior Underwear, Inc.* (1966) 156 NLRB 1236.) In adopting that requirement, the NLRB recognized that there might be other means by which a union "*might* be able to communicate with a substantial portion of the electorate even without possessing their names and addresses. It is rather to say what seems to us obvious—that the access of *all* employees to such communication can be insured only if all parties have the names and addresses of all the voters." (*Id.,* at p. 1241, fn. omitted.)

The rule in dispute here differs from the federal policy in requiring that an employer furnish a list of names and addresses *prior* to the scheduling of an election, upon notice by a union of its intent to organize the employer's employees. Petitioners would have us say that this difference is fatal to the validity of the ALRB's rule. In *Agricultural Labor Relations Bd.* v. *Superior Court, supra,* 16 Cal.3d 392, however, we upheld an ALRB rule providing limited access by union organizers to workers in the fields, despite the fact that under the NLRA access by union organizers to workers in working areas is determined on a case-by-case basis, upon a showing that the particular workers are otherwise inaccessible. Though section 1148 provides that "[t]he board shall follow applicable precedents of the National Labor Relations Act, as amended," we concluded that from this language "the board could fairly have inferred that the Legislature intended it to select and follow only those federal precedents which are relevant to the particular problems of labor relations on the California agricultural scene." (16 Cal.3d at p. 413.) In deciding the question of access, we held that the board was entitled to consider the special characteristics of agricultural labor, including its predominantly migrant quality, the difficulties of communicating with workers as they go to and from work, as well as language and literacy barriers. (16 Cal.3d at pp. 414-415.) In addition, we took note of the ALRA's requirement for swift elections, "a difficulty not faced by the NLRB," and a factor likely to render traditional channels of communication too slow to be effective. (16 Cal.3d at p. 416.)

The board adopted the prepetition list rule in 1976, after this court had upheld the board's access rule, and following public hearings in which the board heard comments from interested parties regarding the access rule in operation. From those hearings and from its own experience the board reached two conclusions: that access should henceforth be limited to periods of seasonal peak, and that during such periods the opportunity of employees and union organizers to communicate with one another should be enhanced by making available to an organizing union a list of employees with names and addresses.

In a subsequent case, *Henry Moreno* (1977) 3 ALRB No. 40, the board explained its reasoning behind the second conclusion. Referring to field contacts with employees under the access rule, the board observed: "Whether or not surveillance in violation of Labor Code § 1153(a) is found in any particular case, the presence of employer representatives, the short time available during non-working time, plus the limits on the numbers of organizers who may be present under the rule clearly mean that this is not the ideal setting for extended or thoughtful discussion of controversial issues." (*Id.*, at p. 5, fn. omitted.) In light of these practical limitations, the board decided "to intensify employee access to information during the period when that information is most relevant by providing for unions to receive pre-petition lists." (*Id.*, at p. 6.) Rather than abandon the access rule, the board explained, it considered the "goal [of maximizing employee access to information] sufficiently important, and the constraints imposed on the exchange of information as a result of seasonal and migratory labor patterns sufficiently severe, to warrant attempting these two complementary solutions, rather than selecting between them." (*Id.*, at p. 6.)

While facilitation of communication between employees and union organizers appears to be the prime motivation for the rule, the board has also explained that the rule serves as an aid to the board's election process: "Under a statutory command to conduct elections within seven days from the time a petition is filed, this Board has required that an election eligibility list be submitted within 48 hours, allowing a maximum of five days for investigation and correction of defects in the list and for use of the list to contact and inform employees of election issues. [Fns. omitted.] These requirements place severe time constraints on the ability of the Board agents to investigate showing of interest, scope and composition of unit questions, and to arrange for orderly conduct of the election itself. This pressure is further compounded by the fact that petitions in any given office are filed within short periods of time corresponding to seasonal peaks in local crops, rather than spread out over the year. If the experience of this Board has taught that secret ballot elections can be properly conducted within seven days, it has also taught that much time is consumed in investigating these questions after the election in challenged ballot and objections proceedings. Moreover, a certain number of elections are inevitably set aside as a result of errors resulting from inadequate information at the pre-election stage. . . . The process of filing a response [to the preelection list requirement] coupled with increased contact with an employer's work force resulting from use of the list itself will bring to light possible disputes over units and voting eligibility 'early in the election campaign rather than in the last few days before the election' [fn. quotation from *Excelsior Underwear, Inc.,* *supra*, omitted]. The parties themselves will be better prepared to respond to both pre- and post-election investigations of such questions, and serious

problems in conduct of the election resulting from short pre-election investigations will be minimized. Thus the pre-petition list requirement as presently enacted will contribute substantially to the prompt and orderly resolution of the election proceedings which are the prerequisite to the collective bargaining process at the heart of this Act." (*Henry Moreno, supra,* 3 ALRB No. 40, at pp. 7-9.)

 The board has authority to promulgate "such rules and regulations as may be necessary to carry out [the provisions]" of the ALRA. (§ 1144.) Those provisions include the fundamental declaration of employee rights "to self-organization, to form, join, or assist labor organizations . . . ." (§ 1152), as well as the board's authority to administer and certify elections (§ 1156.3). The prepetition list requirement is functionally related to both those provisions, and the board's explanation of the necessity for the requirement is patently rational, based upon the board's experience, and well within its policy discretion. Moreover, the statute itself requires, in section 1157.3, that "[e]mployers shall maintain accurate and current payroll lists containing the names and addresses of all their employees, and shall make such lists available to the board upon request." The board's amplification of the statutory mandate to require "current street addresses," as well as classifications of employees, and to provide for furnishing of the lists to a union to facilitate the purposes of the statute, can hardly be considered administrative overreaching. We conclude that the regulation is valid.

## II.

 The board found that both Carian and Peters failed to comply with the prepetition list regulation, and those findings are clearly supported by substantial evidence, as our earlier summarization of the record (see *ante,* pp. 661-664) demonstrates.[6] The question we confront here is

---

[6]Carian also appears to contend that a prior proceeding in superior court between it and the ALRB, in which the board sought enforcement of a subpoena duces tecum served on the grower, forecloses the ALRB from concluding that Carian failed to comply with the prepetition list requirement. Though no record of the trial court proceeding has been presented to us, it appears that after the ALO issued his decision, the board sought "enforcement" of the determination that Carian and Laflin had violated the ALRA, through service on growers Carian and Laflin of subpoenas duces tecum, requesting submission of full and complete lists of employee names and current street addresses to the ALRB. The growers refused, and the board went to superior court to obtain an order mandating compliance with the subpoena. This attempt would have extended the subpoena powers with which the board is vested (see § 1151) beyond the scope intended by the Legislature, and met with little success in the trial court. In refusing to issue the requested order, the court ruled, inter alia, that the growers had complied with the subpoenas as best they could. Carian now seems to contend this judgment in some fashion precluded the ALRB from adopting the ALO's recommendation that the growers had not supplied adequate lists. This claim is not, however, properly before us, inasmuch as Carian did not argue the res judicata or collateral estoppel effect of this determination in his formal exceptions and brief filed with the board. Conse-

whether the board was justified in holding that such conduct constituted an unfair labor practice under section 1153, subdivision (a).

■ Under the NLRA, an employer's failure to comply with an order requiring him or her to furnish the names and addresses of employees prior to an election results in the election being set aside. (*Excelsior Underwear, Inc., supra,* 156 NLRB 1236, 1240.) That would not be an adequate or meaningful remedy for violation of the prepetition list regulation under the ALRA, since a principal purpose of that list is to provide the union with access to employees so as to enable them to organize, and to obtain sufficient showing of interest in order to support a petition that an election be held. Thus, the ALRB cannot be limited to the remedies which the NLRB chooses to impose in a quite different context.

■ The NLRA does, however, provide useful guidance as to the general principles governing application of section 1153, subdivision (a), since the language of that section is virtually identical to its counterpart—section 8(a)(1)—in the federal statute. Under the NLRA, the broad language of section 8(a)(1) is regarded as a vehicle for proscribing a wide variety of employer conduct—including threats of reprisal, surveillance, interrogation, the barring of solicitation on company property—which does not fall within any of the other categories of unfair labor practices, but which may be said either to interfere with the rights of employees protected under the statute, or to coerce or restrain them in the exercise of those rights. (See Gorman, Basic Text on Labor Law (1976) p. 132.)

■, ■ The test for violation of section 8(a)(1) is objective in two respects. First, "to establish a violation of section 8(a)(1), it is not necessary to demonstrate—by direct testimony of employees or otherwise—that particular employees were actually coerced; it is sufficient if the General Counsel can show that the employer's actions would tend to coerce a reasonable employee. This objective standard obviously facilitates the development of a record and the trial of an unfair labor practice case, and also avoids the need to place employees in the discomforting position of testifying against the employer." (Gorman, *op. cit. supra,* at p. 132.) Second, "[i]t is sufficient to demonstrate that the employer action has the *effect* of

---

quently, the point is deemed waived. (See *Butte View Farms* v. *Agricultural Labor Relations Bd.* (1979) 95 Cal.App.3d 961, 971 [157 Cal.Rptr. 476].)

Even if, arguendo, the assertion was properly before us, we would find it without merit. The proceeding in which the board sought to enforce the ALO's determination was not a full-blown evidentiary hearing such as was conducted by the ALO, but merely collateral to the ALRB's review of the unfair labor practice charges. The power to adjudicate unfair labor practice complaints is vested exclusively in the ALRB (§ 1160.9), and cannot be usurped by a trial court ruling on the merits of a motion to enforce a subpoena.

restraint or coercion. It is not necessary to demonstrate that the employer *intended* to produce that effect." (*Id.*, at p. 133.)

While unlawful intent need not be shown, the effect of employer conduct upon employee organizational rights may be offset by a showing that the conduct serves important business needs. "In effect, section 8(a)(1) could be rewritten as follows: It shall be an unfair labor practice for an employer to take action which, regardless of the absence of antiunion bias, tends to interfere with, restrain, or coerce a reasonable employee in the exercise of the rights guaranteed in section 7, provided that the action lacks a legitimate and substantial justification such as plant safety, efficiency, or discipline." (*Ibid.*)

These principles are applied by reviewing courts, moreover, with great deference to the judgment of the administrative agency in determining when particular conduct falls within the statutory ban. In the first section 8(a)(1) case to reach the United States Supreme Court, the NLRB had determined that an employer's rule forbidding solicitation during nonworking time was unlawful under that section, though the rule had been in effect before the advent of the union and had not been adopted with union activity in mind. Upholding the board's determination, the Supreme Court stated: "The Wagner Act did not undertake the impossible task of specifying in precise and unmistakable language each incident which would constitute an unfair labor practice. On the contrary, that Act left to the Board the work of applying the Act's general prohibitory language in the light of the infinite combinations of events which might be charged as violative of its terms." (*Republic Aviation Corp.* v. *Board* (1945) 324 U.S. 793, 798 [89 L.Ed. 1372, 1376-1377, 65 S.Ct. 982, 157 A.L.R. 1081].)

▮ In light of these principles we find no fault with the board's proposition that an employer may violate section 1153, subdivision (a), by refusing or failing substantially to comply with the prepetition list requirement. As we have explained, that requirement is itself rooted in the declaration of employee rights contained in section 1152. It follows that substantial violation of the requirement may reasonably be viewed by the board as interfering with those rights.

We do not mean to suggest that the board may find an employer guilty of an unfair labor practice when the employer has made a reasonable and good faith attempt to comply with the requirements of the rule and, for reasons beyond his control, has been unable to do so. That, however, is not the situation here. Indeed, the ALO found that Carian and Peters were acting, in certain respects, in bad faith in relation to the rule, and those findings are supported by substantial evidence. In appealing to the board from the

decision of the ALO, both employers claimed the statute was "ambiguous" in its reference to "current street addresses," but that claim had not been made earlier and, as the board observed, the record is devoid of evidence that either employer was misled as to what information the board required. Accordingly, the board's finding that Carian and Peters violated section 1153, subdivision (a), by their substantial failure to comply with the prepetition list requirement is sustained.

## III.

The board also found that Carian and Peters violated section 1153, subdivision (a), by distributing "employee information cards" which asked employees for the information required for the prepetition list, but at the same time warned them that the information "may be given by the Agricultural Labor Relations Board to union organizers," and attributed to each employee, through a printed statement above his signature, the pronouncement that he was "not willing to supply any information that I have not written on this card." The board found that "such conduct constitutes interrogation in violation of Section 1153(a) in that the workers were in effect being asked to disclose their attitudes for or against the union by giving or refusing their addresses. [Citation omitted.]"

Under the NLRA, systematic interrogation of employees regarding their attitudes toward a union is an unfair labor practice under section 8(a)(1), except to determine the truth of the union's claim of majority status, and then only by secret ballot and with safeguards designed to communicate to the employees the purpose of the poll and to assure them against reprisal. (*Struksnes Const. Co.* (1967) 165 NLRB 1062, 1063.) The reason, in the view of the NLRB, is that "any attempt by an employer to ascertain employee views and sympathies regarding unionism generally tends to cause fear of reprisal in the mind of the employee if he replies in favor of unionism and, therefore, tends to impinge on his Section 7 rights. . . . '[A]n employer cannot discriminate against union adherents without first determining who they are.' [Fn. omitted.] That such employee fear is not without foundation is demonstrated by the innumerable cases in which the prelude to discrimination was the employer's inquiries as to the union sympathies of his employees." (*Id.,* at p. 1062.)[7]

No reason is suggested, and none appears, why the ALRB may not properly view interrogation as an unfair labor practice under the ALRA. Indeed,

---

[7]The current NLRB has adopted a more restrictive view with respect to individual interrogation, insisting that the employer's words or the context in which they are used suggest an element of coercion or interference. (*Rossmore House* (1984) 269 NLRB II 198.)

the argument for doing so is more substantial than under the federal act, since an employer subject to the state statute may not voluntarily recognize or bargain with a union absent a state conducted election (§ 1153, subd. (f)), and thus, unlike the situation under the NLRA, can have no persuasive business justification for ascertaining union majority status.

■ The only issue pertaining to this aspect of the case, therefore, is whether the ALRB was justified in finding the "employee information cards" to be a form of prohibited interrogation. ■ ■ Under the principles considered in part II of this opinion, that issue does not turn upon whether the employer *intended* them to be interrogative of his employee's attitudes toward the union, or whether he *intended* thereby to coerce or intimidate them (see *W. A. Sheaffer Pen Company* v. *N.L.R.B.* (8th Cir. 1973) 486 F.2d 180, 182), or whether there was evidence that some employees actually felt coerced or intimidated. The issue turns, rather, upon whether the ALRB could properly find that employees were likely to perceive the language on the cards as calling upon them to indicate, to their employer, whether they wished to have further communication with the union and its organizers.

■ Under the circumstances, the board's evaluation of the likely impact of the cards upon employees seems entirely reasonable. The record is barren of evidence that employees had expressed reluctance to supply information regarding their current street addresses, or that they had sought guidance from the employer as to their right to refuse to supply such information. Thus, it is quite plausible that employees would view the gratuitous warning on the card that information they supplied might be furnished to union organizers, in combination with the suggestion that they could refuse to supply information as they wished, as being more than a paternalistic gesture on the part of their employer. If they provided their street address, notwithstanding the warning and the suggestion, their response could be more than neutral; their employer would know that they were open to visitation by union organizers.

Nor can the employer's conduct be justified by a claim that he was acting in the interests of his employees, to protect their privacy. A similar argument—that to provide the union with employee names and addresses subjects employees to the dangers of harassment and coercion in their homes— was rejected by the NLRB in its *Excelsior* opinion, *supra,* 156 NLRB 1236: "We cannot assume that a union, seeking to obtain employees' votes . . . will engage in conduct of this nature; if it does, we shall provide an appropriate remedy. [Fn. omitted.] We do not, in any event, regard the mere possibility that a union will abuse the opportunity to communicate with employees in their homes as sufficient basis for denying this opportunity

altogether." (*Id.,* at p. 1244.) The NLRB also reasoned that "[a]n employee's failure to provide a union with his name and address, whether due to inertia, fear of employee reprisal or an initial predisposition to vote against union representation, is not, as we view it, an exercise of Section 7 rights to refrain from union activity." (*Ibid.*) And, in *N. L. R. B.* v. *J. P. Stevens & Co.* (4th Cir. 1969) 409 F.2d 1207, the court rejected the claims of intervening employees that an *Excelsior*-type order impaired their constitutional rights of privacy: "It is unlikely that a union seeking votes to be cast in a secret ballot election would alienate potential support by overly aggressive campaigning. Remedies are of course available if misconduct should occur. [Citation.] However, the mere possibility that employees will be inconvenienced by telephone calls or visits to their homes is far outweighed by the public interest in an informed electorate. [Citations.]" (*Id.,* at p. 1209.) While the rule at issue in this proceeding requires information at the organizing phase, prior to an election, the public interest is surely no less.

Finally, the employer's conduct cannot be justified by a claim that he was attempting to protect his record in the event he was later charged with supplying inadequate information. As we have observed, there is no evidence that either employer encountered resistance from employees in supplying the requisite information. In any event, if some employees refused or failed to fill out the card completely, it is hardly plausible that a statement supplied by the employer above the signature line would be regarded by the ALRB as evidence of the reason.

The ALRB's finding that the employers' conduct in distributing the "employee information cards" constituted an unfair labor practice under section 1153, subdivision (a), is sustained.

### IV.

As so often in labor law matters, the issue of remedy is somewhat anticlimactic. Nearly six years have passed since the board issued its decisions in these cases, ordering the employers to cease and desist their unlawful activity and take certain affirmative action, including the posting, mailing, and reading of notices to employees; the furnishing of a petition list in accordance with the board's regulation; and the provision of expanded access to the union during the then current and succeeding harvest season. It seems doubtful whether these remedies can yet serve a useful purpose, yet neither party claims the issue of remedy to be moot. We proceed to review the challenges asserted by each employer in its petition for review.

We begin by observing, as in the case of the NLRB, that the board's remedial powers are necessarily broad: "[I]n the nature of things [the Leg-

islature] could not catalogue all the devices and stratagems for circumventing the policies of the Act. Nor could it define the whole gamut of remedies to effectuate these policies in an infinite variety of specific situations. [The Legislature] met these difficulties by leaving the adaptation of means to end to the empiric process of administration. The exercise of the process was committed to the Board, subject to limited judicial review. Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the dangers of sliding unconsciously from the narrow confines of law into the more spacious domains of policy." (*Phelps Dodge Corp.* v. *Labor Board* (1941) 313 U.S. 177, 194 [85 L.Ed. 1271, 1283, 61 S.Ct. 845, 133 A.L.R. 1217].) In general, the board's remedial order "should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can be fairly said to effectuate the policies of the Act." (*Virginia Electric Co.* v. *Board* (1943) 319 U.S. 533, 540 [87 L.Ed. 1568, 1574, 63 S.Ct. 1214]; see also *Labor Board* v. *Seven-Up Co.* (1953) 344 U.S. 344, 348 [97 L.Ed. 377, 382, 73 S.Ct. 287]; cf. *Republic Steel Corp.* v. *Labor Board* (1940) 311 U.S. 7, 12-13 [85 L.Ed. 6, 10-11, 61 S.Ct. 77].)

▇▇ The board ordered that the employers grant the union one hour of access to its employees during work time. The remedy is reasonably related to the offense, and is designed to redress the imbalance in communication caused by that offense, as well as "to dispel lingering doubts regarding the effectiveness of the law." (*Jackson and Perkins Company* (1977) 3 ALRB No. 36, at pp. 5-6.) The employers offered no evidence suggesting that the cost of the remedy would be excessive in relation to its benefit. We conclude that the remedy was within the board's discretion.

The board ordered the employers to provide a prepetition employee list. Peters contends that the provision of such a list will only result in further charges because the information which the board requires cannot be prepared. As we have indicated (see *ante*, p. 670) these employers have not demonstrated good faith and reasonable efforts to comply with the board's rule. Hence, the objection is without merit.

Carian contends that all of the remedies are inappropriate because an election has been held among its employees. "It is self evident from the fact that an election was held," Carian argues, "that the UFW had sufficient contact with petitioner's employees to hold an election." It follows, in Carian's view, that preelection access was unnecessary, and all remedies are punitive. This argument ignores the fact, however, that the union lost.

The orders are affirmed.

Broussard, Acting C. J., Mosk, J., Kaus, J., Reynoso, J., Lucas, J., and Dalsimer, J.,* concurred.

Petitioners' application for a rehearing was denied September 26, 1984. Bird, C. J., did not participate therein.

---

*Assigned by the Chairperson of the Judicial Council.