[Civ. No. 20242. Fourth Dist., Div. Two. Mar. 28, 1985.]

LAFLIN & LAFLIN, Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

## COUNSEL

David E. Smith and James W. Hall for Petitioner.

Dennis M. Sullivan, Marvin J. Brenner, Thomas M. Sobel, Ellen Lake, Manuel M. Medeiros and Daniel G. Stone for Respondent.

Jerome Cohen, Sanford N. Nathan, Kirsten L. Zerger, Ellen Greenstone, W. Daniel Boone, Tom Dalzell, Michael Heumann, Linton Joaquin, Dianna Lyons, Mary H. Mocine, John Rice-Trujillo, Deborah Wiener, Marco E. Lopez, Carlos M. Alcala, Francis E. Fernandez, Carmen S. Flores, William H. Carder, Daniel A. Garcia and Wendy Sones for Real Party in Interest.

## OPINION

**KAUFMAN, J.**—Laflin & Laflin aka Laflin Date Gardens (petitioner or Laflin) seeks statutory review of a final order of the Agricultural Labor Relations Board (ALRB or Board) determining that petitioner committed an

unfair labor practice by partially failing to comply with ALRB's "pre-petition employee list" regulation (Cal. Admin. Code, tit. 8, §§ 20910 and 20310, subd. (a)(2))[1] and ordering petitioner to take specified affirmative action. (All statutory references are to sections of the Labor Code unless otherwise specified; the Agricultural Labor Relations Act as codified will be referred to as ALRA.)

This court filed its decision in this matter initially on October 12, 1983. However, hearing was granted by the California Supreme Court and, ultimately, the matter was retransferred to this court for decision in light of *Carian* v. *Agricultural Labor Relations Bd.* (1984) 36 Cal.3d 654 [205 Cal.Rptr. 657, 685 P.2d 701]. The matter is therefore again before us for decision.

*Facts*

Petitioner is an agricultural employer primarily engaged in date farming and to a lesser extent grape and citrus growing. Petitioner employs a small permanent work force but utilizes a considerably larger number of employees according to its seasonal needs.

In March 1977 the United Farm Workers of America, AFL-CIO (UFW) began an organizing campaign among the employees of petitioner. On March 14 UFW served a notice of intent to take access and on March 29 a notice of intent to organize. Around the time UFW filed its notice of intent to organize, petitioner employed a grape-thinning crew for approximately four and one-half days. Viewing and interpreting the unclear evidence most favorably to the decision below, it appears that the crew was on petitioner's property at the time it was first notified a notice of intention to organize had been filed. However, within a half day thereafter the work was completed

---

[1]So far as is here pertinent, regulation 20910 provides in substance that any labor organization that has filed a valid notice of intent to take access on a designated employer may file a notice of intention to organize the agricultural employees of the same employer signed or accompanied by authorization cards signed by at least 10 percent of the current employees of the designated employer and that, within five days thereafter, the employer must furnish to ALRB an employee list as described in section 20310, subdivision (a)(2) of ALRB's regulations. Upon verifying that the notice of intention to organize was signed or accompanied by authorization cards signed by at least 10 percent of the current employees of the employer, ALRB makes a copy of the employee list available to the filing labor organization and any other labor organization that files a valid notice of intent to organize within 30 days. The employer is not required to furnish more than one such list in any 30-day period.

The employee list thus required has come to be known as a "pre-petition employee list." Regulation 20310, subdivision (a)(2) describes an employee list as "[a] complete and accurate list of the complete and full names, *current street addresses,* and job classifications of all agricultural employees . . . in the payroll period immediately preceding the filing of the petition." (Italics added.)

and the crew departed. So far as the evidence discloses they had not ever worked for petitioner before and were never again employed by petitioner thereafter.

The crew boss was a man named Tony Gonzales. The only two witnesses who testified at the hearing were Ben Laflin and Robert Nies, the executive vice president of Sun World Packing Corporation, another agricultural employer in the Coachella Valley area, which frequently assisted other growers in obtaining crews for seasonal or occasional work. Neither witness knew whether or not Gonzales was a licensed farm labor contractor.[2] In any event, apparently Mr. Gonzales had a crew consisting of a number of workers who worked more or less regularly together. They had done work for Sun World and were referred to Laflin in this instance through Sun World.

On April 5, 1977, Laflin timely supplied ALRB a list of employees with addresses. Seventy-seven employees were named. Only post office box addresses were given for 30, and 2 addresses were outside the Coachella Valley area. Mr. Laflin testified that the information furnished concerning the members of the crew was obtained from cards or a list supplied by Sun World.

Petitioner was thereafter notified by a representative of ALRB that the information supplied was inadequate. Mr. Laflin testified he then communicated with Robert Bianco, a field man at Sun World, informed Mr. Bianco that the Board required for each employee a "current street address," and requested further employee information. Mr. Laflin testified that by this time the employees were no longer in petitioner's employ and that his only source of information at that point was Sun World. Subsequently, according to Mr. Laflin, additional cards containing employee addresses were furnished him by Sun World, and he took them to his attorney for compilation and resubmission to the Board along with any other employee information the attorney might be able to gather.

On May 3, 1977, a supplemental list was furnished to ALRB naming 69 employees. For 20, including all of petitioner's permanent employees, street addresses were given. However, for 48 employees only post office box addresses were provided and for 1 no address was listed.

---

[2]The indication is that he was not. Mr. Nies testified that where a crew is hired through a farm labor contractor, the grower pays the total wages to the contractor in one check and that the contractor is responsible for paying the individual workers. In the case at bench Mr. Laflin testified that he paid the workers individually. The ALO, however, referred to Gonzales as a labor contractor.

On April 14, 1977, on the basis of charges filed by UFW on April 6, ALRB's general counsel issued and served on petitioner a complaint alleging that petitioner had committed an unfair labor practice by failing partially to comply with the prepetition employee list regulation. Laflin filed an answer denying the charging allegations of the complaint. The case was joined with a number of other unfair labor practice cases in which three other agricultural employers were alleged to have committed similar unfair labor practices.[3] Separate hearings were noticed and had in each case before an administrative law officer (ALO). Both the ALO and the Board, respectively, dealt with all the cases in a single decision designated 4 A.L.R.B. No. 28.

On the basis of the testimony of Sun World's vice president, Mr. Nies, the ALO found as follows: "I find that Respondent Laflin's explanation concerning its failure and delay in supplying employee names and addresses to the Board, in light of Nies' testimony, to be without merit and discredit fully the testimony of Ben Laflin in this regard. Laflin's facile and inaccurate explanations, the fact that the second list . . . was even more incomplete than the first, and the fact that it consulted an attorney before submitting this second list all provide additional evidence of Respondent Laflin's bad faith in dealing with the whole question of the submission of employee lists to the Board."

After considering petitioner's exceptions to the ALO's recommended decision and proposed order, the Board affirmed the rulings, findings and conclusions of the ALO "as modified" in its decision.[4] The portion of the Board's decision relating to this alleged unfair labor practice read: "Respondents Carian, Laflin, and Peters excepted to the ALO's finding that

---

[3] The other agricultural employers involved were Harry Carian, Richard Peters Farms, and Henry Moreno. Carian and Richard Peters Farms were petitioners in companion review proceedings in this court (4 Civ. 20243 and 4 Civ. 20244). The ultimate decisions in those cases are reported under the title *Carian* v. *Agricultural Labor Relations Bd., supra,* 36 Cal.3d 654.

[4] Although petitioner in this case has made no point of it, we observe that Board's practice of adopting or affirming the rulings, findings and conclusions of the ALO "as modified herein" or "to the extent consistent with this opinion" is quite unsatisfactory in many cases so far as a reviewing court is concerned. In the recommended decisions of the ALO that have come before us, specific findings of fact other than the jurisdictional facts have generally not been made. Rather, factual determinations have generally been scattered throughout the decision as part of the reasoning or conclusions. The decisions of the Board that have come before us are in much the same form. When the Board states that it adopts the findings of the ALO "consistent with" its decision or "as modified" in its decision, the task of determining which findings of the ALO were deemed by the Board "consistent with" or "modified by" its decision are relegated to the reviewing court. That is undesirable both from the standpoint of the Board and the reviewing court. Moreover, it brings into question the sufficiency of the findings required by section 1160.3.

they submitted incomplete lists and thereby violated Section 1153(a). The record supports the ALO's detailed findings that the lists provided by these three Respondents did not satisfy the requirements of 8 Cal. Admin. Code Section 20910. Supplying lists of names with either post office boxes or street addresses outside the Coachella Valley clearly interferes with employees' Section 1152 rights, which include the opportunity of workers to communicate with and receive information from labor organizations about the merits of self-organization. *See Henry Moreno* (1977) 3 A.L.R.B. No. 40. A labor organization's ability to have any sort of effective communication with workers employed at such places as these where the workers are present only four and a half days to two weeks, only once or twice a year, is severely impeded by the task of locating and talking with workers through post office boxes or addresses beyond commuting distance from the Coachella Valley. We affirm the ALO's conclusions concerning these violations of Section 1153(a).''

### Contentions and Discussion

The decision in *Carian* v. *Agricultural Labor Relations Bd., supra,* 36 Cal.3d 654 (see fn. 3, *ante*) has disposed of several of petitioner's major contentions. In *Carian* the California Supreme Court rejected the contention that ALRB's promulgation of the prepetition employee list regulation (Cal. Admin. Code, tit. 8, § 20910 [see fn. 1, *ante*]) was in excess of its authority, constituted a usurpation of the legislative function and was not reasonably necessary to effectuate the purposes of ALRA. (*Carian, supra,* 36 Cal.3d at pp. 665-668.) The court also there rejected the contention that a prior subpoena enforcement proceeding between Laflin and the ALRB involving the same employee lists as are here in issue (see *Agricultural Labor Relations Bd.* v. *Laflin & Laflin* (1979) 89 Cal.App.3d 651, 664-665, fn. 14 [152 Cal.Rptr. 800]) is res judicata on the question of whether or not Laflin complied with the regulation. (*Carian, supra,* 36 Cal.3d at pp. 668-669, fn. 6.) Accordingly, those contentions are rejected.

We are thus brought to Laflin's remaining contentions: (1) ALRB's determination Laflin committed an unfair labor practice by its partial failure to comply with the prepetition employee list regulation is not supported by substantial evidence on the whole record and (2) the Board's remedial order is unlawful and overbroad in several respects and in its entirety is so disproportionate to petitioner's conduct that it must be characterized as punitive and retributive rather than remedial. ▪ Although we find the question a close one, we conclude the record does contain substantial evidence to support the finding of an unfair labor practice. We conclude, however, petitioner's contentions concerning the remedial order are well founded.

*Substantial Evidence*

█ We emphatically reject the ALO's conclusion, apparently adopted by the Board (see fn. 4, *ante*), that petitioner's consulting its attorney constituted evidence of bad faith. A person dealing with legal problems arising out of recently enacted legislation and recently promulgated administrative regulations which if not properly attended to may result in serious economic consequences is fully privileged to consult his or her attorney prior to taking action of any kind and his or her so doing does not give rise to a rational inference that he or she is acting in bad faith.

Additionally, the ALO's conclusion, apparently adopted by the Board (see fn. 4, *ante*), that the testimony of Mr. Nies was irreconcilably inconsistent with that of Mr. Laflin is not supported by the record. The ALO referred to Nies' testimony (1) that Sun World required employees who work directly for the company and who are not hired through a licensed labor contractor to fill out employee information cards containing their names, street addresses and social security number; but that under no circumstances would Sun World release such cards to another agricultural employer to whom a crew is lent, and (2) that Nies did not know of any instance where a grower such as Laflin had requested employee information in the custody of Sun World, and that even if it had, Sun World's policy was not to release its records.

However, Laflin did not testify he received Sun World's original records. In his testimony he spoke variously of being furnished documents, a list or cards, but whatever the records were, they could, consistent with the testimony of both witnesses, have been copies of the original records. Moreover, Nies testified that, except for Sun World's policy of not letting its records out of its hands, he had no personal knowledge whatever of the whole affair. His job was supervisorial and administrative, and any request for employee information, which he acknowledged was a possibility, would be handled by a field man or someone else. He testified expressly he did not know whether or not Ben Laflin had requested employee information or whether any such information had been supplied him. Further, consistent with Mr. Laflin's testimony, he testified that until the end of the thinning season Sun World itself did not realize that "street" addresses had to be obtained to satisfy ALRB, and that it was not until in late April or May that Sun World had commenced keeping really accurate employee records. He related that upon being subpoenaed to testify, he had conferred with Robert Bianco, a field man, and verified that Gonzales' crew was referred to Laflin, but the only other thing he ascertained was that Sun World had not paid the crew for the work at Laflin's. Specifically, he did not ascertain from Bianco

whether Laflin had requested employee information or whether any employee information had been supplied.

Nevertheless, we conclude there is substantial evidence to support the determination that Laflin committed an unfair labor practice in failing to comply with the prepetition employee list regulation. Whether or not it had actual knowledge, as an agricultural employer petitioner was charged with knowledge that upon the filing of a notice of intent to organize it would have to supply a prepetition employee list with a "current street address" for each employee. Mr. Laflin's testimony indicates petitioner was not misled by any possible ambiguity in the term "current street address." Even if the employees in the crew had finished their work and gone by the time the list became due and the necessary information was by that time unavailable, petitioner was not absolved of the original responsibility to supply a proper list. Petitioner could have and should have made an effort to obtain the requisite information at the time the workers were hired.

It is also suggested that because the grape thinning crew had left petitioner's employ by the time the employee list was due and, so far as the record shows, never worked for petitioner after that time, no purpose was to be served by the UFW's communicating with these particular workers and so no rights protected under ALRA were interfered with. We do not agree.

Although the employee list was not due until five days after the UFW filed its notice of intention to organize (see fn. 1, *ante*), the employees to be listed were those on the payroll for the preceding payroll period, including the grape thinning crew. While it may be unlikely a petition for certification could have been filed before the end of the next payroll period (which would make the employees on the latter payroll the ones eligible to vote at the election (see § 1157)), we cannot say as a matter of law that could not have been done, nor can we say that under no circumstances could authorizations signed by the grape thinning crew count toward the 50 percent showing of interest needed by the union to petition for certification (see § 1156.3, subd. (a)).

No actual interference with employee rights was required to be shown, only that the conduct complained of reasonably tended to interfere with the free exercise of rights under the ALRA. (*Carian* v. *Agricultural Labor Relations Bd., supra,* 36 Cal.3d at pp. 669-670.)

The unfair labor practice determination will be affirmed.

*The "Remedial" Order*

At oral argument petitioner urged that the remedial order is moot, that is, that petitioner's malfeasance, if any, was minor and occurred over seven years ago and that its compliance with Board's order would serve no useful function now. (See *Carian* v. *Agricultural Labor Relations Bd., supra,* 36 Cal.3d 654, 673.) While Board did not identify any purpose to be served by the remedial order at this time, it nevertheless did not agree the matter was moot, so we address it.

Having concluded petitioner committed this single unfair labor practice, Board issued a three-page "remedial" order which in paragraph 1. commanded petitioner inter alia to cease and desist from: "a. Refusing to provide the ALRB with an employee list as required by 8 Cal. Admin. Code Section 20910(c) (1976). [¶] b. In any other manner interfering with, restraining, or coercing any employee in the exercise of rights guaranteed by Section 1152 of the Agricultural Labor Relations Act."

Paragraph 2. commanded petitioner to take affirmative action in pertinent part as follows: "a. Execute the Notice to Employees[5] attached hereto" and upon its translation by a Board Agent into appropriate languages, "reproduce sufficient copies in each language for the purposes" thereafter specified including posting copies of the notice for a period of 90 consecutive days at places to be determined by the regional director and mailing a copy of the notice, in all appropriate languages, to each of the employees in the bargaining unit at his or her last known address.

Paragraph 2.d. required the petitioner to "[p]rovide for a representative of the [petitioner] or a Board Agent to read the . . . Notice in appropriate languages to the assembled employees of the [petitioner] on company time . . . at such times and places as are specified by the Regional Director." It further provided: "Following the reading, the Board Agent shall be given the opportunity, outside the presence of supervisors and management, to answer any questions employees may have concerning the Notice or their rights under the Act. The Regional Director shall determine a reasonable rate of compensation to be paid by [petitioner] to all non-hourly wage employees to compensate them for time lost at this reading and the question-and-answer period."

---

[5]The prescribed notice contained general advisements to employees of their rights under the ALRA and promised Laflin would "[not] do anything in the future that forces you to do, or stops you from doing, any of the things listed above." Finally it provided: "WE WILL NOT refuse to provide the Agricultural Labor Relations Board with a current list of employees when the UFW or any union has filed its 'Intention to Organize' the employees at this ranch."

As further affirmative action under paragraph 2. petitioner was ordered by subparagraph e. to "[p]rovide the ALRB with an employee list forthwith, as required by 8 Cal. Admin. Code, Section 20910(c) (1976)."

Subparagraphs 2.g., 2.h. and 2.i. command petitioner to give UFW expanded access: one organizer for each fifteen employees in addition to those normally prescribed by the access regulations; one additional thirty-day access period during the 1978 calendar year over and above the four periods already prescribed by the access regulations; and "access to [petitioner's] employees during regularly scheduled work hours for one hour, during which time the UFW may disseminate information to and conduct organizational activities among [petitioner's] employees. . . . After conferring with both the Union and [petitioner] concerning the Union's plans, the Regional Director shall determine the most suitable times and manner for such contact between organizers and [petitioner's] employees. During the times of such contact no employee will be required to engage in work-related activities, or forced to be involved in the organizational activities. All employees will receive their regular pay for the one hour away from work. The Regional Director shall determine an equitable payment to be made to non-hourly wage earners for their lost production time."

As this court held in *George Arakelian Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1980) 111 Cal.App.3d 258, 277 [168 Cal.Rptr. 537], and as Board now concedes, that part of the restraining order found in subparagraph b. of paragraph 1. is impermissibly overbroad.

Subparagraph d. of paragraph 2. dealing with the reading of the prescribed notice to the assembled employees of petitioner on company time is both uncertain and overbroad. It appears to include all employees both temporary and permanent and whether in the bargaining unit or not. Additionally, no time limit is placed upon the question and answer periods and no limit is placed upon the number of readings nor the number of question and answer periods, all of which appear to be left to the uncircumscribed discretion of the regional director.

The requirement of subparagraph e. of paragraph 2. that petitioner provide "the ALRB with an employee list *forthwith, as required by 8 Cal. Admin. Code, Section 20910(c) (1976)*" (italics added) is internally inconsistent and, depending upon what is meant, appears to be in conflict with ALRB's regulations. Regulation 20910 does not require a petitioner to provide the ALRB with an employee list "forthwith." It does not require any list to be furnished unless and until a labor organization has filed a notice

of intent to organize accompanied by a 10 percent showing of interest on the part of the employees in the appropriate bargaining unit.

■ In addition, the expanded access provisions found in subparagraphs g., h. and i. of paragraph 2. appear to relate to all of petitioner's employees, whether permanent or temporary and whether in the bargaining unit or not. To that extent they are overinclusive.

As to several defects Board requests that we modify the order to accord with its current practice or to update the order. However, remand to the Board would be required in any event with respect to the remaining problems noted. ■ Moreover, after reviewing the record and the order in their entirety, we have concluded petitioner's contention that the order is punitive and retributive rather than remedial is meritorious.

■ The federal decisions as well as recent decisions of the courts of this state establish that because the relation of remedy to policy is peculiarly a matter of administrative competence, the Board must be given relatively free rein in determining which remedy would effectuate the policies of the act. (E.g., *Phelps Dodge Corp.* v. *Labor Board* (1941) 313 U.S. 177, 194 [85 L.Ed. 1271, 1283, 61 S.Ct. 845, 133 A.L.R. 1217]; *Carian* v. *Agricultural Labor Relations Bd., supra,* 36 Cal.3d at pp. 673-674; *Pandol & Sons* v. *Agricultural Labor Relations Bd.* (1979) 98 Cal.App.3d 580, 588-589 [159 Cal.Rptr. 584]; see also *Fibreboard Corp.* v. *Labor Board* (1964) 379 U.S. 203, 216 [13 L.Ed.2d 233, 241-242, 85 S.Ct. 398, 6 A.L.R.3d 1130].) Nevertheless, the Board's discretion in ordering affirmative action to remedy unfair labor practices "is not unbounded. It must be exercised reasonably by the Board whose 'power to command affirmative action is remedial, *not punitive, . . .*'" (*Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 93 Cal.App.3d 922, 940 [156 Cal.Rptr. 152], quoting in part from *Edison Co.* v. *Labor Board* (1938) 305 U.S. 197, 236 [83 L.Ed. 126, 143, 59 S.Ct. 206], italics in original.)

When the order of the Board is so severe in comparison to the conduct involved and its effect on the free exercise of employee rights that it is clearly punitive in character, the order will be annulled. (*Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd., supra,* 93 Cal.App.3d at p. 940.) "[I]t is not enough to justify the Board's requirements to say that they would have the effect of deterring persons from violating the Act. That argument proves too much, for if such a deterrent effect is sufficient to sustain an order of the Board, it would be free to set up any system of penalties which it would deem adequate to that end. [¶] . . . [A]ffirmative action to 'effectuate the policies of this Act' is action to achieve the remedial

objectives which the Act sets forth." (*Republic Steel Corp.* v. *Labor Board* (1940) 311 U.S. 7, 12 [85 L.Ed. 6, 10, 61 S.Ct. 77].)

 The affirmative action required of petitioner by Board's order is so disproportionate to the conduct of petitioner involved in the unfair labor practice and the resulting interference with employee rights that the order here can only be characterized as punitive rather than remedial. The record demonstrates no continuing or pervasive pattern of conduct on the part of petitioner interfering with the free exercise of rights protected under the ALRA. Petitioner's conduct did not involve threats or acts of violence, coercion or intimidation against employees or even conduct of which the employees were aware. The conduct involved was a partial failure to comply with the ALRB's prepetition employee list regulation soon after its promulgation and at a time when, the evidence indicates, neither this petitioner nor other growers were fully aware of the "current street address" requirement or the tremendous importance attached by the Board to full and complete compliance. Moreover, "current street addresses" were furnished for all of petitioner's permanent employees so that there was no interference with the union's communicating with those employees. The failure was in not providing "current street addresses" for the members of a grape thinning crew who worked for petitioner for a total of four and a half days and whose work was completed no later than one-half day after petitioner was first informed a notice of intent to organize had been filed and who thereafter, so far as the record shows, never worked for petitioner again. While we have concluded petitioner's conduct reasonably tended to interfere with protected rights and so constituted an unfair labor practice, no actual interference with the free exercise of employee rights appears to have occurred and in the unique circumstances of this case any possible interference was more theoretical than real.

While, as the Board argues, the right to access provides an alternative means of communicating with workers, the increased access afforded UFW by Board's order is clearly out of all proportion to any possible actual interference with communication between the UFW and the grape thinning crew resulting from petitioner's conduct. The order greatly enlarges upon normal access in every dimension. The normal access periods are increased by one quarter; the normal number of organizers is increased by one for every fifteen employees; in addition the UFW is to have access to all employees, whether their rights were affected or not, for one hour during working time, and all employees are to be paid for "the one hour away from work" whether they attend the organizational activities or not. All this is in addition to the provision for question and answer periods to be con-

ducted without limitation on company time by a Board agent following the reading of the prescribed notice.

Singly and separately each required affirmative action might be regarded as remedial, but considered collectively and cumulatively the conclusion is inescapable that the order was designed to punish petitioner and make an example of it rather than to remedy any interference with communication between the union and the members of the grape thinning crew.

### Disposition

The determination that petitioner committed an unfair labor practice in failing partially to comply with the prepetition employee list regulation is affirmed. However, the order of the Board is annulled and the proceeding is remanded to the Board for formulation of a proper remedial order consistent with this opinion.

Morris, P. J., and Rickles, J., concurred.

Respondent's petition for review by the Supreme Court was denied June 20, 1985.