[L.A. No. 31885. Feb. 11, 1985.]

KARAHADIAN RANCHES, INC., Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO, Real Party in
Interest.

2

4

**COUNSEL**

Seyfarth, Shaw, Fairweather & Geraldson, Stacy D. Shartin and William J. Dritsas for Petitioner.

Marvin J. Brenner, Ellen Lake, Manuel M. Medeiros, Thomas Sobel, David Schneller, Daniel G. Stone, M. Jeffrey Fine and Cathy Christian for Respondent.

Dianna Lyons, Daniel A. Garcia, Wendy Sones, Marco E. Lopes, Carlos M. Alcala, Francis E. Fernandez, Carmen C. Flores, Jerome Cohen, William H. Carder, Ellen Greenstone and Tom Dalzell for Real Party in Interest.

**OPINION**

**KAUS, J.**—Karahadian Ranches, Inc. (Karahadian) seeks review of a decision of the Agricultural Labor Relations Board (ALRB or board) which

determined that it committed a number of unfair labor practices during the spring of 1977. We conclude that the decision should be upheld.

Karahadian is an agricultural employer subject to the Agricultural Labor Relations Act (Lab. Code, § 1140 et seq. [ALRA]).[1] It is owned by Milton Karahadian as a family corporation and farms some 570 acres of grapes in Riverside County. Between March 3 and June 8, 1977—the period in which certain alleged unfair labor practices occurred—the number of agricultural workers employed by Karahadian varied from about 200 to 375. Milton Karahadian was the overseer and in charge of labor relations.

The United Farm Workers of America, AFL-CIO (UFW), a labor organization within the meaning of section 1140.4, subdivision (f), filed charges with the board against Karahadian. The general counsel of the board filed a complaint accusing the employer of 12 acts of unfair labor practices.[2] Karahadian filed an answer denying the charges. The case was then heard

---

[1]All statutory references are to the Labor Code unless otherwise indicated.

[2]The complaint alleged that Karahadian violated section 1153, subdivision (a), by interfering with, restraining and coercing its employees in the exercise of their rights and violated section 1153, subdivision (c) by discriminating in regard to hiring practices, tenure of employment, and the terms and conditions of employment. The acts alleged to have caused these violations were: "[1] On or about March 3, 1977, at its labor camp, [Karahadian] through its supervisor and agent Johnny Augustinez interrogated its employees as to union affiliation. [¶] [2] On or about April 24, 1977, at its labor camp, [Karahadian] through its supervisor and agent Johnny Augustinez created the impression of surveillance of its employees. [¶] [3] On or about April 24, 1977, at its labor camp, [Karahadian] through its supervisor and agent Johnny Augustinez threatened to discharge an employee if he engaged in union activity. [¶] [4] On or about April 26, 1977, at its labor camp, [Karahadian] through its supervisor and agent Tony Luna created the impression of surveillance of its employees. [¶] [5] On or about April 26, 1977, [Karahadian] through its supervisor and agent Tony Luna interrogated an employee concerning his union affiliation and activities. [¶] [6] On or about April 27, 1977, at its property near 58th Avenue and Buchanan Street, [Karahadian] through its supervisor and agent Milton Karahadian interrogated its employee concerning his union activities. [¶] [7] On or about April 27, 1977, at its property near 58th Avenue and Buchanan Street, [Karahadian] threatened to discharge an employee if he engaged in union activity. [¶] [8] On or about March 23, 1977, on its property, [Karahadian] through its agent Tony Mendez, in the course of a speech against unionization promised benefits to its employees, including medical insurance. [¶] [9] On or about April 28, 1977, [Karahadian] through its foreman Johnny Augustinez threatened to fire any worker who signed an authorization card. [¶] [10] On or about April 27, 1977, [Karahadian] through its supervisor and agents Johnny Augustinez and Tony Luna, hired crews for thinning grapes, and discriminatorily refused to hire Javier Reyes, Obed Valdez. [¶] [11] On or about June 3, 1977, [Karahadian] through its supervisor and agent Felicitas Espinoza discriminatorily changed the conditions of employment of Maria Elena Ferrel because of her union activities, sympathies and affiliation. [¶] [12] On or about June 8, 1977, [Karahadian] through its supervisor and agent Felicitas Espinoza discriminatorily discharged Maria Elena Ferrel because of her union activities, sympathies, and affiliation."

by an administrative law officer (ALO) between June 15 and July 13, 1977, in Coachella, California.

The ALO concluded that 10 of the 12 alleged unfair labor practices had been committed. Pursuant to title 8, California Administrative Code, part II, section 20282 (ALRB regulations), Karahadian filed exceptions with respect to eight of the ten violations and also took exception to the ALO's proposed order. The board considered the record and the ALO decision in light of the exceptions and affirmed six of the eight violations found by the ALO and contested by Karahadian. The board's remedial order was essentially the same as that proposed by the ALO—Karahadian was ordered to cease and desist from interfering with, restraining or coercing employees in the exercise of their rights and was ordered to read and mail a notice to all employees that it had violated the ALRA.

Karahadian seeks review with respect to four of the six unfair labor practices found by the board: The creation of an impression of surveillance of employee Hamiid Ali on April 26, 1977 (charge 4); unlawful interrogation of employee Hamiid Ali by Tony Luna on April 26, 1977 (charge 5) and by Milton Karahadian on April 27, 1977 (charge 6); and the unlawful discharge of employee Maria Ferrel on June 8, 1977 (charge 12).

The events which gave rise to the alleged unfair labor practices charges occurred during the spring of 1977. At the time, Karahadian had a union contract with the International Brotherhood of Teamsters, due to expire on April 16, 1977. Karahadian had had a contract with the UFW from 1970 to 1973, and the UFW was attempting once again to represent Karahadian's employees. In the late winter and early spring of 1977, the UFW filed notices of intent to take access and intent to organize. Similar notices were filed by two other agricultural workers unions. The UFW conducted an intense campaign which culminated in a representation election on June 24, 1977.

Karahadian undertook a "no union" campaign and, through the Farm Bureau, hired an agent to conduct it. The agent held two seminars for Karahadian's supervisors and foremen to instruct them on ALRA requirements and proper conduct during the representation campaign.[3] Milton Karahadian had meetings with his supervisors once or twice a week to discuss labor

---

[3]The board found that Karahadian's employees, Juan "Johnny" Augustinez, Tony Luna and Felicitas Espinosa, were supervisors within the meaning of section 1140.4, subdivision (j). Karahadian was therefore generally responsible for their acts. (See *Vista Verde Farms* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 307 [172 Cal.Rptr. 720, 625 P.2d 263].)

relations. They talked about access rights, employee discipline, and the "do's and don'ts" of the law, including the prohibition of discrimination against employees because of union activity.

*Interrogation and Surveillance*
*of Employee Hamiid Ali on April 26, 1977*

Karahadian claims that there is no substantial evidence to support the board's determination that Karahadian committed an unfair labor practice under section 1153, subdivision (a), by creating the impression that Hamiid Ali was under surveillance on the evening of April 26, 1977 (charge 4) and by unlawfully interrogating Ali (charge 5). (See § 1160.8; *Martori Brothers Distributors* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 721, 727-728 [175 Cal.Rptr. 626, 631 P.2d 60]; *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335 [156 Cal.Rptr. 198, 595 P.2d 975].)

Between 10 and 10:30 on the evening of April 26, 1977, Hamiid Ali and UFW Attorney William Monning drove into the labor camp in Monning's car after spending several hours at a bar in town. Monning parked his car, which had a UFW bumper sticker affixed to its rear bumper, in front of the kitchen. They entered the camp kitchen to prepare some food. About four or five minutes later, Tony Luna came in and asked Hamiid what was going on. Hamiid replied that he was preparing some food. After looking at Monning, who was wearing a red and black UFW button on his lapel, Tony Luna turned to Hamiid and asked, "Who is this with you, this from Chavez?"[4] Hamiid responded, "No, this friend of mine." Luna then left the kitchen. Hamiid and Monning continued to prepare a meal which they consumed in 15 to 20 minutes. When they were about to leave the kitchen they found that Tony Luna had been listening to their conversation by pressing his ear to the outside of the kitchen door. When they confronted Luna after catching him in the act, Luna asked Monning again if he was with the UFW. Monning replied only by telling Luna his name and then said goodnight to Hamiid, thanked him for the food, and left. Luna then asked Ali if he had been to Chavez' office, to which Ali responded, "That's my business." Based on these facts, the ALO found and the board agreed that there was an unlawful surveillance or impression of surveillance, as well as an unlawful interrogation.

■ The board's conclusion that Karahadian committed an unfair labor practice by creating an impression of surveillance is supported by the evi-

---

[4]An obvious reference to Caesar Chavez of the UFW.

dence. Karahadian claims that the story told by Ali and Monning is a fabrication which should be disbelieved, but it fails to show that the testimony was inherently unreliable or incredible.

█    Only surveillance which "interferes with, restrains or coerces union activities" is prohibited. (*N.L.R.B.* v. *Southwire Company* (5th Cir. 1970) 429 F.2d 1050, 1054; see *Carian* v. *Agricultural Labor Relations Bd.* (1984) 36 Cal.3d 654, 669 [205 Cal.Rptr. 657, 685 P.2d 701].) Actual intimidation or coercion need not be shown, only that the conduct would reasonably tend to restrain or interfere with the employee's rights. (*Carian, supra,* 36 Cal.3d at p. 669.)   █    While the argument has been made that undetected surreptitious surveillance can have no coercive effect on employees (*N.L.R.B.* v. *Southwire Company, supra,* 429 F.2d at p. 1054),[5] it is manifest that eavesdropping on a conversation between a union attorney and an employee, when detected by the employee, would inevitably tend to have an intimidating effect. The board's determination that an unfair labor practice had occurred must be sustained.

█    The board's determination that on the same occasion there took place an unlawful interrogation is also supported by the evidence. Section 1152 recognizes the right of workers to be visited by union organizers at their homes, regardless of where their homes are located. (*Silver Creek Packing Co.* (1977) 3 ALRB No. 13.) Monning was, therefore, lawfully present at the camp kitchen. Although Karahadian asserts that its supervisor was merely inquiring into the identity of a stranger in the camp, the facts show that such questions were superfluous and thus suspect. Monning's car bore a UFW bumper sticker and he was wearing a UFW lapel button—facts sufficient to identify Monning as being associated with the UFW. In addition, the supervisor questioned Ali whether he had been at the union office, an obvious reference to Ali's union activity, which implied displeasure. There is ample evidence to support the conclusion that there was an interrogation and that such questioning would reasonably tend to have an inhibiting effect on an employee's exercise of his rights.

*Interrogation of Employee Hamiid Ali*
*On April 27, 1977*

█    Karahadian also claims that the board's finding that it unlawfully interrogated Hamiid Ali on the next day, April 27, 1977, is not supported by substantial evidence.

---

[5]The argument was rejected: "It would be a surprising result if the law were such that an employer could engage in any devious spying technique it desired so long as the program was not detected by employees." (*Id.* at p. 1054.)

On April 27, 1977, Hamiid Ali was thinning grapevines with fellow employee Nage. Ali testified that Milton Karahadian approached him as he was working, that they exchanged greetings, and that Milton Karahadian asked him if he was with Chavez. Ali replied in the affirmative. Milton Karahadian then asked: "What happened with your friend, he got shot the other night?" Ali replied that his friend was in the field with him and that he did not get shot. Milton Karahadian then said: "Chavez, your friend, he shoot him." Ali testified that he believed that Karahadian was referring to Nage and that Karahadian was trying to convince him that Chavez would shoot his people.

Nage, through an interpreter, testified that he heard Milton Karahadian ask Ali, "What happened to your friend who was shot? Did Chavez send someone to kill him? Do you want your friend to be killed?"

Milton Karahadian testified that he asked Ali how Chavez was doing. He stated that his question about Chavez "was a passing thing"—casual conversation with his employees on points of interest to them. He recalled asking how Ali's friend was, but did not ask whether Chavez had shot at him.

Karahadian was charged with two unfair labor practices, based on implied threat (charge 7) and unlawful interrogation (charge 6). The ALO rejected the theory that what Karahadian said constituted an implied threat: he found that the conversation could have been viewed either as innocent inquiries or as a veiled threat that unionization would bring violence, but that the evidence was unclear and contradictory in that respect. The ALO did find, however, that the conversation amounted to an unlawful interrogation concerning union activity.

Karahadian claims that Milton Karahadian's general, isolated casual remark asking about Chavez did not constitute coercive interrogation and thus does not support finding an unfair labor practice within the meaning of the act.

An unfair labor practice is defined as conduct that interferes with, restrains or coerces employees in the free exercise of their rights (§ 1153, subd. (a)). The National Labor Relations Act (NLRA) provides useful guidance on the general principles governing the application of section 1153, subdivision (a), since the language of that section is almost identical to its federal counterpart—section 8(a)(1) of the NLRA: "The test for violation of section 8(a)(1) is objective in two respects. First, 'to establish a violation of section 8(a)(1), it is not necessary to demonstrate—by direct testimony of employees or otherwise—that particular employees were actually

coerced; it is sufficient if the General Counsel can show that the employer's actions would tend to coerce a reasonable employee. This objective standard obviously facilitates the development of a record and the trial of an unfair labor practice case, and also avoids the need to place employees in the discomforting position of testifying against the employer' [Gorman, Basic Text on Labor Law (1976) p. 132.] Second, '[i]t is sufficient to demonstrate that the employer action has the *effect* of restraint or coercion. It is not necessary to demonstrate that the employer *intended* to produce that effect.' (*Id.*, at p. 133.)" (*Carian* v. *Agricultural Labor Relations Bd.*, *supra*, 36 Cal.3d 654, 669-670.) "[T]he question is not whether an employee actually felt intimidated but whether the employer engaged in conduct which may reasonably be said to interfere with the free exercise of employee rights under the Act." (*Joy Silk Mills* v. *N.L.R.B.* (D.C.Cir. 1950) 185 F.2d 732, 743-744; see also *Pandol & Sons* v. *Agricultural Labor Relations Bd.* (1979) 98 Cal.App.3d 580, 586 [159 Cal.Rptr. 584].)

■  Whether a particular interrogation reasonably tends to interfere with rights guaranteed under the act is a determination which is within the board's expertise (*N.L.R.B.* v. *Miller Redwood Co.* (9th Cir. 1969) 407 F.2d 1366, 1369; *Abatti Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1980) 107 Cal.App.3d 317, 334 [165 Cal.Rptr. 887]). Its determination that an interrogation occurred and that it interfered with an employee's rights must stand if supported by substantial evidence (*Rivcom Corp.* v. *Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743, 746 [195 Cal.Rptr. 651, 670 P.2d 305]).

■  In light of these principles we find no fault with the board's finding that Karahadian committed an unfair labor practice in the interrogation of Hamiid Ali on April 27. Even though the conversation, viewed in isolation, may appear innocuous, examined against a backdrop of unfair labor practices and antiunion animus, its coercive potential emerges. (*N.L.R.B.* v. *Ajax Tool Works, Inc.* (7th Cir. 1983) 713 F.2d 1307.) The record shows that in a period of eight weeks between March 3 and April 28, 1977, Karahadian was involved in seven incidents of conduct—including threats of discharge, surveillance, and interrogation—which may be said to have interfered with the rights of the employees or coerced or restrained them in the exercise of those rights. As to two of the incidents Karahadian did not dispute the finding of unfair labor practices: it filed no exceptions to the ALO's finding that on or about April 24 Karahadian threatened to discharge an employee if he engaged in union activity (charge 3) and a finding that on or about April 28 Karahadian threatened to fire any worker who signed an authorization card (charge 9).

As discussed above, unfair labor practices were also committed on April 26 when supervisor Luna created an impression of surveillance and unlawfully interrogated employee Hamiid Ali and his companion Monning. (*Ante,* p. 8.) Just two days before, another Karahadian supervisor (Augustinez) had created an impression of surveillance of Hamiid Ali, accusing him of lying and indicating that he had seen Ali "all the time behind the Chavez office in Coachella." Karahadian did not seek review of that finding (charge 2) nor of the finding that on March 3 the same supervisor interrogated Hamiid Ali and another employee as to union affiliation (charge 1).

When the interrogation of Ali by the owner, Milton Karahadian, is viewed in the context of the incidents that surrounded it, we cannot say that the board erred in concluding that the questioning could reasonably have tended to have an inhibiting effect on the employee's rights to organize and, thus, constituted an unfair labor practice.[6]

### Discharge of Employee Maria Ferrel

Finally, Karahadian contends that the board's determination that it committed an unfair labor practice by dismissing employee Maria Ferrel is contrary to law and not supported by substantial evidence. (Charge 12.)

Maria Ferrel, an experienced farmworker, came to work for Karahadian on March 14, 1977. Originally she performed other work, but from May 25 until her discharge on June 8, she was employed as a grape packer. She testified that she regularly passed out UFW leaflets and buttons to other workers and tried to obtain signatures on authorization cards. She was the only packer who handed out UFW literature.

The packing took place in a packing trailer. The workday for packers officially started at 5:30 a.m. when the pickers went into the fields, but on an average it took 15 to 20 minutes for grapes to arrive at the packing station. On June 1 Ferrel passed out leaflets in the packing trailer about 5:50 a.m., before the pickers had delivered any grapes for packing.

Felicitas Espinosa, Ferrel's supervisor, warned Ferrel that if she passed out flyers on company time, she would be fired. Ferrel testified she recalled

---

[6]Karahadian contends that questioning a known union organizer does not constitute coercive interrogation in the absence of threats of reprisal or promises of benefits. Karahadian points to a recent decision by the NLRB, *Rossmore House* (1984) 269 NLRB II 198, as support for this proposition and asserts that the ALRB is required to follow this precedent (§ 1148). In *Rossmore House,* the NLRB rejected a rule that questioning an employee, particularly a known union supporter, is illegal per se. The NLRB, however, reaffirmed the "totality of the circumstances" test used by the board in the present case.

responding to Espinosa that "there were no grapes and nothing to pack yet" but Espinosa responded: "Don't worry, you should be there standing ready." Ferrel further testified that she was unaware that she was being paid by the company for the period prior to the arrival of the grapes. She also testified that while she had been warned not to hand out leaflets, she had not been warned against handing out buttons.

On June 1, the same day, Beatrice Vela, second foreperson in charge of packing, approached Ferrel and told her to "go and pick" because there were not enough grapes.[7] Ferrel felt this was discriminatory; she preferred packing to picking, citing the following reasons: picking requires more work in the sun; you are required to carry a heavier box further; you must put more into your box; it takes longer to fill a box; in general it is harder work; and the pay is better for packers. She testified she had said to Vela that there were "others here with less seniority, why are you taking me down?"

Vela stated that Espinosa had made the decision to switch packers to picking and that no one except Ferrel had complained or asked for an explanation. Ferrel was told the transfer was just for that day. Vela testified she had asked other workers to change to picking before asking Ferrel, noting she was some distance away from Ferrel at the time the decision to switch packers to picking was made. Vela had been present earlier when Espinosa had warned Ferrel about passing out leaflets.

On June 5, Ferrel was interviewed on a local radio station. She identified herself and her employer, her crew and crew-boss, and spoke about the advantages of a union contract. The program was broadcast twice. Ferrel regularly prepared a list of workers in the crew to make certain no one was being fired and checked it each day before work, during the break, and after work as well.

On June 8, 1977, Ferrel assembled with other workers before work. She handed out about 40 UFW buttons and some union leaflets. At 5:30 a.m., Espinosa sounded a car horn to signal the start of the work day and gave instructions to the assembled employees as to their respective duties for the day. Since the grape pickers had just gone out into the fields, there were not yet any grapes to be packed. About 5:45 a.m., while waiting at her station for a trailer of grapes to be brought in, Ferrel noticed that a late

---

[7]Discrepancies in the testimony and the findings as to the date of this incident (variously stated as on or about June 3 [charge 11], June 1 [by the employee], and June 3 [by the board]) are not addressed by the parties.

arriving worker was walking toward the packing station. Ferrel left her work station and approached the worker and, on reaching her, pinned a UFW button on her and briefly said something to her. At the same time, supervisor Espinosa had been walking toward the worker in order to give her instructions. Espinosa reached the worker just after Ferrel and, after instructing the worker on the day's assignment, turned to Ferrel and said, "You're fired."

Espinosa testified that Karahadian had given its supervisors the authority to hire and fire, but had instructed them not to fire anyone for union solicitation on work time unless the employee had been warned previously and the supervisor had witnessed the second offense. Espinosa further stated she had been "crew boss" since March 15, 1977, and before that had worked as a packer as well as a picker. In respect to the warning issued on June 1, her testimony was consistent with Ferrel's. Her testimony was also consistent with that of Ferrel as to the events of June 8, leading to Ferrel's discharge, with one major exception: Espinosa testified that on several occasions Ferrel had "mocked" her, by mimicking her orders, laughing, etc. She testified this behavior "got on her nerves" and was embarrassing. She had cried about it. She testified she had not warned Ferrel about this type of conduct or spoken with her about it, that it was "in [her] mind" when she decided to terminate Ferrel and that she felt people were "losing respect" for her as a crew boss. She thought Ferrel "was trying to prove a point to the people that we were afraid of her." She also testified that she had warned another UFW organizer, Santiago Orozco, not to hand out union leaflets on company time and that he had violated the rule a second time but had not been fired because the second violation was not witnessed by her but only by Beatrice Vela. Ferrel, when recalled as a rebuttal witness, testified that she had never contradicted Espinosa's orders or "mocked" her.

The ALO found that Ferrel was transferred from packer to picker on June 1 because of her union activity, that the June 8 discharge for alleged violation of the no-solicitation rule was pretextual, and that the discharge was based, in part, on Ferrel's activities as a union organizer.[8] The findings and conclusions of the ALO are somewhat confusing, however, in that he as-

---

[8]"In my observation of the demeanor of Ms. Espinosa, it was clear that the decision to terminate Ms. Ferrel was a highly emotional one, and that she considered the union's organizational drive to be a personal threat to her reputation, position and power. . . . In sum, I conclude that the discharge of Maria Elena Ferrel was pretextual and, in part, based on her activities as a union organizer. While cause existed for her termination, it was outweighed in the mind of her supervisor by anti-union animus. Her highly subjective and emotional attitudes toward union organizers, and the exercise by employees of their rights to 'complain about everything' in a context of great personal hostility, led directly to the discharge."

sumed in his findings that there was cause for the discharge based on the no-solicitation rule, but thereafter concluded that the rule was invalid.[9]

The board affirmed all of the findings of the ALO except as to the discriminatory transfer: it was not persuaded that there was a causal connection between Ferrel's conduct and her subsequent selection for temporary picking duty. The board did not dispute the ALO's finding that the firing of Ferrel was pretextual.

■ Although the board's rejection of the finding of discriminatory transfer weakens the decision of the ALO to some extent, we nevertheless conclude that there was ample evidence, aside from the transfer, to support the finding of a pretextual discharge. The testimony of Espinosa[10] herself justifies the ALO's finding that the discharge was "pretextual and, *in part,* based on her activities as a union organizer" (italics added)—"she was trying to prove . . . that we were afraid of her"—and the board expressly affirmed "the ALO's conclusion that [Karahadian] violated Section 1153(c) and (a) of the Act by its discharge of Ferrel . . . ." In sum, the board found that Karahadian did "interfere with, restrain, or coerce agricultural employees in the exercise of the rights guaranteed in Section 1152" (§ 1153, subd. (a)) and "by discrimination in regard to . . . tenure of employment . . . [did] discourage membership in any labor organization" (§ 1153, subd. (c)).

As to the no-solicitation rule, the board resolved the confusion in the ALO's findings and conclusions and expressly—and correctly—held that, even if valid on its face, the rule "may not be applied to prohibit conduct which does not interfere with work, even when the employees are paid for such nonworking time." Absent California authority, the board properly applied federal law in deciding that no-solicitation rules enforced during nonworking times unnecessarily interfere with employees' rights under the ALRA.

In *Exide Alkaline Battery Division of E.S.B., Inc.* v. *N.L.R.B.* (4th Cir. 1970) 423 F.2d 663, enforcing 177 NLRB 778, the court upheld an NLRB

---

[9]Thus, although the ALO stated that Ferrel "violated a company rule against distribution of union literature or buttons on company time," and "cause existed for her termination," he found that Karahadian had not met its burden to establish the validity of the rule; he concluded that "the no-solicitation rule is invalid on its face presumptively, as well as in application."

[10]See *ante,* page 13. The ALO stated: "[T]he testimony of Ms. Espinosa concerning Ms. Ferrel's alleged 'mocking,' which was 'in my mind' when Espinosa terminated Ms. Ferrel, and Espinosa's comments to the effect that Ms. Ferrel's behavior had diminished her authority and created 'complaints about everything,' in diminution of her control of the crew are sufficient to raise an inference of discriminatory intent."

finding of a NLRA section 8(a)(1) violation where an employee had been discharged for violating a no-solicitation rule while waiting in line to "clock out" at the end of the work day. The NLRB held that, although the employee was technically on paid time, the enforcement of the rule unlawfully restricted protected activity under the NLRA. In *N.L.R.B.* v. *Mueller Brass Co.* (5th Cir. 1974) 501 F.2d 680, the court again upheld an NLRB finding against the employer for a discharge based on an alleged violation of a no-solicitation rule. The alleged solicitation had occurred during nonworking time—that period of time after the employee had "clocked in" but before he had received his work assignment. The NLRB stated that application of the rule to such nonworking time would serve no legitimate end of the employer and would interfere with the employees' rights to self-organization.

Karahadian asserts that the board's decision would permit an employee to engage in solicitation whenever that employee was "idle," i.e., not working, and such a result would produce chaos in the work place. The argument was rejected in *Mueller Brass*: "The Company argues that the Board approach equates work time with time during which manual labor is actually being performed and that, under this approach, solicitation would be permitted during such events as company meetings. We do not so construe the board's findings. Here there was a customary nonworking interval after the employees . . . reported to their work area and before they were given their work assignments for the night . . . . This customary nonwork interval is fairly indistinguishable from the period before clocking out in *Exide Alkaline Battery* and from customary breaks and lunch periods." (501 F.2d at pp. 684-685, fn. 6.) It is undisputed here that there was a "customary nonworking interval" after the 5:30 a.m. work signal—Espinosa sounding a car horn—and the time the grapes arrived to be packed. This period is indistinguishable from customary breaks and lunch periods in which employees are permitted to engage in protected activities.

In sum, we conclude that the board's decision that the discharge of Ferrel violated section 1153, subdivisions (a) and (c) is supported by the record and is sustainable on two grounds—(1) that reliance on a business justification (violation of the no-solicitation rule) was a pretext for discharge for union activities, and (2) that the no-solicitation rule, in the circumstances of this case, provided no business justification for the discharge.

### The Remedial Order

As part of its decision in this case, the board ordered Karahadian to cease and desist its unlawful activity and take certain affirmative action, including

posting, mailing, and reading of notices to employees; furnishing of all payroll records and reports to the board in order to determine the amount necessary to make Ferrel whole; and offering to reinstate Ferrel. Karahadian challenges certain parts of the board's remedy.

As we noted in *Carian, supra,* the board's remedial powers are broad and the remedial order " 'should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can be fairly said to effectuate the policies of the Act.' " (*Carian* v. *Agricultural Labor Relations Bd., supra,* 36 Cal.3d at p. 674, citing *Virginia Electric Co.* v. *Board* (1943) 319 U.S. 533, 540 [87 L.Ed. 1568, 1574, 63 S.Ct. 1214].)

The board ordered Karahadian to cease and desist from or "[i]n any other manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 1152 of the Agricultural Labor Relations Act." Karahadian contends that the language of this section of the order is overly broad because it raises the possibility of contempt proceedings for future violations and goes beyond the particular conduct found to be unlawful.

The board may restrain a party from committing unfair labor practices not found proved where they are similar to, may be anticipated from, or are otherwise related to practices found proved. (*Labor Board* v. *Express Pub. Co.* (1941) 312 U.S. 426, 436-437 [85 L.Ed. 930, 937, 61 S.Ct. 693].) The board may restrain conduct not found proved where the record reveals "numerous attempts" by the employer to abridge its employees' rights (*Allegheny Pepsi-Cola Bottling Co.* v. *NLRB* (3d Cir. 1959) 312 F.2d 529, 532). The record supports the board's cease and desist order. Karahadian committed eight unfair labor practices in a period of less than three weeks, six in a period of five days. Four were committed through the same supervisor, two through his second foreman, and one by Milton Karahadian, an owner and person in charge of labor relations for Karahadian. We conclude that the remedy was within the board's discretion.

The board ordered Karahadian to read and mail to each employee the notice that Karahadian had violated the ALRA. Karahadian contends that the reading requirement can only be used in special circumstances such as where a significant percentage of the work force is illiterate. It asserts that nothing in the record supports an implicit finding that its employees are illiterate. The remedy is appropriate when a substantial part of the work force is illiterate (*N.L.R.B.* v. *Bush Hog, Inc.* (5th Cir. 1968) 405 F.2d 755, 758-759), and, as we noted in *Tex-Cal Land Management Inc., supra,* 24 Cal.3d at page 355, the board may properly rely "on its knowl-

edge from past hearings of significant illiteracy and semi-literacy among farmworkers.''

The decision of the board is affirmed.

Broussard, Acting C. J., Mosk, J., Reynoso, J., Grodin, J., Lucas, J., and McClosky, J.,* concurred.

*Assigned by the Acting Chairperson of the Judicial Council.