[No. D001423. Fourth Dist., Div. One. May 17, 1985.]

HOLTVILLE FARMS, INC., Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

**COUNSEL**

Dressler, Quesenbery, Laws & Barsamian and Larry A. Dawson for Petitioner.

Daniel G. Stone and Charles R. Landau for Respondent.

Dianna Lyons, Daniel A. Garcia and Wendy Sones for Real Party in Interest.

**OPINION**

**WIENER, J.**—The petition for review filed by Holtville Farms has been reviewed and considered by Presiding Justice Brown, Justices Wiener and Butler. The petition is denied. (See *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335 [156 Cal.Rptr. 1, 595 P.2d 579].) Although we can summarily deny the petition without explanation, we elect not to do so in this case. We carefully consider every petition filed in ALRA matters. Administratively, in every case a memorandum is drafted, considered and modified by each justice on the panel reviewing the petition. To avoid any confusion or erroneous belief that petitions which are summarily denied are summarily examined and reviewed, we believe it will be helpful to set out the reasons for the court's summary dismissal of the petition in this case. We do not wish to set a precedent by taking this procedure in every case, but do it here to show how we typically handle such matters. The discussion which follows is essentially a selective portion of an internal memorandum.

This is a petition for review of a make-whole order by the ALRB to remedy a refusal to bargain found in 7 ALRB 15. Holtville Farms argues: the ALRB (Board) abused its discretion by utilizing the Sun Harvest contract as comparable in determining wages the Holtville Farms' employees lost as a result of the company's refusal to bargain; pay to employees for their lunch break was erroneously considered by the Board to be wages rather than a fringe benefit; the formula used to compute fringe benefits the employees lost as a result of the company's refusal to bargain is punitive; the Board's most recent decision on computation of fringe benefits should have been applied retroactively to this case; the administrative law judge (ALJ) and Board erred in rejecting evidence on the company's economic condition and this rejection deprived it of due process of law; and, the Board decision is not based on substantial evidence in that there was no evidence that the company would have entered into a contract paying the wages ordered by the Board had it not refused to bargain.

*Utilization of Sun Harvest Contract as Comparable*

■    Labor Code section 1160.3 provides the Board with authority to order employees made whole for loss resulting from an employer's refusal to bargain. In applying this remedial power, the Board has broad discretion. (*J. R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1 [160 Cal.Rptr. 710, 603 P.2d 1306].) As the Supreme Court recently noted in *Carian* v. *Agricultural Labor Relations Bd.* (1984) 36 Cal.3d 654, 674 [205 Cal.Rptr. 657, 685 P.2d 701]: " 'Because the relation of remedy to

policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the dangers of sliding unconsciously from the narrow confines of law into the more spacious domains of policy.' [Citation omitted.] In general, the board's remedial order 'should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can be fairly said to effectuate the policies of the Act.'" [Citations omitted.]

When this remedial discretion is applied to the duty to determine the amount appropriate to make employees whole, "the Board may use as close approximations as possible, and may adopt formulas reasonably designed to produce such approximations." (*N. L. R. B.* v. *Brown & Root, Inc.* (8th Cir. 1963) 311 F.2d 447, 452.) "'In any case, there may be several equally valid methods of computation, each yielding a somewhat different result. . . . The fact that the Board necessarily chose to proceed by one method rather than another hardly makes out a case of abuse of discretion.' [Citations omitted.]" (*Butte View Farms* v. *Agricultural Labor Relations Bd.* (1979) 95 Cal.App.3d 961, 967-968 [157 Cal.Rptr. 476].)

Labor Code section 1160.8 provides, in pertinent part, "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall . . . be conclusive." As the Supreme Court noted in *Rivcom Corp.* v. *Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743, 756 [195 Cal.Rptr. 651, 670 P.2d 305], "If there is a plausible basis for the Board's factual decisions, we are not concerned that contrary findings may seem to us equally reasonable, or even more so."

■ Petitioner challenges the Board's legal finding that in ascertaining the wages Holtville Farms' employees would have received but for the company's refusal to bargain, it had the discretion to determine that rate from one contract rather than an average of contracts and the Board's factual determination that the Sun Harvest contract was appropriate for this purpose.

The purpose of the underlying hearing was to determine the loss, if any, sustained by employees of Holtville Farms, caused by its refusal to bargain with the union which had been selected by its employees as their bargaining representative. In a very early case, *Adam Dairy* (1978) 4 ALRB No. 24 (petn. rev. den.), the Board held that to determine the loss sustained by such employees, if any, it is necessary to compare the wages and fringe benefits received by the employees with what they would have received had the employer not refused to bargain. To determine what they would have re-

ceived, the Board used the state-wide average of all UFW contracts then existent. In the years since 1978, the Board has attempted to determine what the employees would have earned through various similar approaches.

In *Kyutoku Nursery, Inc.* (1982) 8 ALRB No. 73, the Board used one contract, the Pik 'd Rite collective bargaining agreement as comparable to calculate make whole. In *Robert H. Hickam* (1983) 9 ALRB No. 6, the Board used a group of 10 comparable contracts. In *Kawano, Inc.* (1984) 10 ALRB No. 17, the Board used a group of eight comparable contracts. In *C. Mondavi & Sons* (1984) 10 ALRB No. 19, contracts with three Napa Valley vineyards were used.

The Board has thus varied from utilizing an average of the wage rate in all UFW contracts to utilization of one contract, in its efforts to determine what the employees would have received had the company not refused to bargain. When utilization of an average versus utilization of one contract is analyzed in light of the applicable principles of law, the Board's choice should be upheld unless it is found to be a "patent attempt to achieve ends other than those which can fairly effectuate the policies of the Act." Here, it does not seem to be so. While it is an approximation and alternatives equally or more reasonable may be chosen by this court if it were deciding the case de novo, the Board's choice does seem to be a reasonable approximation of the loss sustained by the employees.

The ALRB found the Sun Harvest contract to be a reasonable choice because, "it was executed approximately when the make-whole period began; Sun Harvest grows the same crops in the same geographic region as Respondent; the Sun Harvest contract includes job classifications that are similar to the job classifications in Respondent's work force; and Respondent concedes that it twice unilaterally raised its employees' wage rates to reflect the Sun Harvest rates." (*Holtville Farms, Inc.* (1983) 10 ALRB 13.)

Respondent challenges the use of the Sun Harvest contract on the basis that Sun Harvest is dissimilar to Holtville Farms: Sun Harvest was a farming and harvesting company while Holtville Farms was only a farming company; Sun Harvest operated in a number of locations in California and Arizona while Holtville Farms operated only in the Imperial Valley; and the two companies grew different crops. It further argues that the averaging approach of *Adam Dairy* is required.

While Sun Harvest and Holtville Farms are not identical, a substantial portion of the business of both is the growing of lettuce in the Imperial Valley. The wage rates utilized by the ALRB were for the Imperial Valley

portion of the Sun Harvest operation for the same classifications as those of Holtville Farms (farming as opposed to harvesting) for the same crop (lettuce). The Sun Harvest contract was signed one month after the Holtville Farms' make-whole period commenced to run. The similarity between the two companies' work forces was made even more evident when Holtville Farms twice unilaterally raised the wages of its employees to match those of the Sun Harvest contract.

In short, the comparable contract standard utilized by the ALRB to determine what the Holtville Farms' employees lost as a result of petitioner refusing to bargain with the union is reasonable and the Sun Harvest contract is appropriate to use for the purpose of comparison.

Petitioner notes that the Sun Harvest agreement was entered into one month after Holtville Farms' make-whole period commenced. It argues that for this reason its use is inappropriate. As the Board points out in its brief, the fact that the refusal to bargain period and execution of the Sun Harvest contract do not perfectly coincide does not make use of that contract as one entered into by a comparable employer unreasonable. The record supports the Board's finding that the Sun Harvest wage rate was agreed to by another Imperial Valley grower, effective several months before the refusal to bargain period commenced. The issue before the Board was to arrive at a reasonable approximation of what the employees lost as a result of the company's refusal to bargain, not to arrive at a perfect amount of the loss.

*Fringe Benefits*

Petitioner contends that the Board incorrectly treated wages it pays employees during their lunch break as wages rather than fringe benefits, that application of the *Hickam* formula to compute fringe benefits was punitive and that the Board should have retroactively applied its most recently expressed standard for computing fringe benefits.

It is not contested that "fringe benefits" are part of the "pay" which may be ordered by the Board to make employees whole for loss resulting from an employer's refusal to bargain. Fringe benefits may take the form of deposits by the employer with an insurance company for medical insurance or the State Employment Development Department for unemployment insurance, or it may take the form of money given directly to the employee for overtime or vacation pay. Whatever the form, it is a cost to the employer and a benefit to the employee. In *Adam Dairy, supra,* the Board ordered that the per hour cost of fringe benefits be calculated and paid directly to employees for loss of the benefits during the period their employer refused

to bargain. In determining the amount of fringe benefits owed, in *Adam Dairy,* the Board chose not to determine the amount on a detailed item-by-item basis, but rather, a set percentage of the wage determined to be comparable for the package of benefits. Based upon the evidence before the Board and its taking judicial notice of Department of Labor, Bureau of Labor Statistics publication, the Board found that the fringe benefits valued at 22 percent of the total comparable earning package was appropriate.

In 1983, the Board modified the theory to compute fringe benefits. In *Robert H. Hickam, supra,* the Board deducted 6.3 percent from the 22 percent fringe benefits because that percent represented mandatory fringe benefits, such as unemployment insurance, which were not subject to negotiations. The Board then compared the nonmandatory fringe benefits the employees actually received with the 15.7 which they assumptively would have received had the employer not refused to bargain.

In *J.R. Norton* (1984) 10 ALRB 42, the Board recognized that the formula used in *Adam Dairy* was outdated and that more contracts which could be used as comparables were available at this time than had been available at the time *Adam Dairy* was decided. It held that henceforth the value of fringe benefits would be determined in the same manner utilized to determine the amount of lost wages: by comparing the value of those actually received with the value of those received under contracts in comparable situations. The Board specifically stated that the new formula was to be applied in cases which had not yet gone to hearing. In those cases in which a hearing had been held but the case had not yet been transferred to the Board, it was left to the discretion of the ALJ to reopen the hearing and apply the new formula or proceed under the *Adam Dairy* formula. The instant case fell within the latter group. The ALJ decided to proceed under the former formula.

■ In the present case, for the purpose of computing fringe benefits and wages received by the employees during the make-whole period, the Board considered pay for the one-half hour lunch period as wages, not a fringe benefit. In analyzing this issue, the Board first noted that most of the statistical authorities seem to consider paid lunch breaks as fringe benefits; that Labor Code section 200 defines wages as the amount paid for labor and that petitioner argues that since the employees were not working during the lunch break, they were not paid for labor. Finally, the Board notes that the general counsel has cited no authority to the contrary. However, the Board then reaches the conclusion that the paid lunch break was not a fringe benefit. The conclusion is challenged by petitioner on the ground that it will be forced to provide employees with a substantial sum of money which will be

a windfall. Additionally, it is argued that the Board's legal analysis of this issue is erroneous.

To make this finding, the Board had to start out with a legal standard, i.e., under one set of circumstances, a benefit received is a wage, under another set of circumstances, it is a fringe benefit. If the Board applied the incorrect standard to the facts, that is an abuse of discretion, i.e., an error of law. Petitioner contends this error of law was made.

The Board finding was based on application of two legal principles. One was utilization of the old *Hickam* formula to determine lost value of fringe benefits. Applying the principle quoted above from in *Carian* v. *Agricultural Labor Relations Bd.*, *supra*, 36 Cal.3d 654, use of the *Hickam* formula was proper. The second legal principle applied by the Board was used for its determination that paid lunch breaks were wages not fringe benefits. The Board adopted the ALJ findings on this issue. The ALJ applied the principle of law used under the Fair Labor Standards Act to determine whether there has been a failure to pay the minimum wage. Whether a paid break or lunch period is considered wages received (or is a fringe benefit) depends on "whether idle time is spent predominately for . . . employee's benefit and whether the time is of sufficient duration and taken under such conditions that it is available to employees for their own purposes disassociated from their employment time." (ALJD, p. 19.) The test is in the conjunctive—(1) time spent primarily for employees benefit, *and* (2) sufficient duration to be available for employees' own purposes, disassociated from employment. Applying this principle he found the money received for lunch break time was wages, not fringe benefits. This finding was based on the following evidence: the employees did not work during their break; they ate, which was beneficial to both employee and employer; and because the lunch break was short, the employees could not entirely disassociate themselves from work.

There is no NLRB precedent directly applicable to this issue. The principle applied by the administrative law judge is as close as any. For this reason, it was not an abuse of discretion to apply. The fact that a new approach to ascertain the loss of fringe benefits was set out in *J.R. Norton*, *supra*, 10 ALRB No. 42, on October 5, 1984, six months after the instant case was decided, did not cause the application of old fringe benefit formula to be an abuse of discretion. Under *In re Marriage of Brown* (1976) 15 Cal.3d 838 [126 Cal.Rptr. 633, 544 P.2d 561, 94 A.L.R.3d 164], whether a change in the interpretation of law is retroactive depends upon public reliance on the old rule and effort involved in applying the new rule. The Board's application of this rule in the present case is supported by substan-

tial evidence. The only possible abuse of discretion could be in the Board's factual finding that there was substantial evidence to support a conclusion that the lunch break was spent primarily for the employees' purposes and taken under conditions that make it available to employees for their own purposes disassociated from their employment. While the purpose of the break seems to be primarily for the employee's benefit, there was evidence sufficient to support a finding that it was too short to make it available to employees for their own purposes disassociated from employment. Since the legal principle relied upon is in the conjunctive, both parts thereof must exist for it to apply. Since one is missing, the ALJ finding is supported by substantial evidence.

### *Evidence of the Company's Economic Condition*

■ At the administrative hearing, the ALJ would not allow the company to introduce evidence of its economic condition. The company argued that the relevance of this evidence is that it demonstrates that the economic condition of the company precluded it from having entered into a contract with the union with the cost of the Sun Harvest contract.

Petitioner accurately states the premise which is the background for a make-whole order. The order is aimed at compensating employees for loss sustained as a result of their employer's refusal to bargain. Petitioner argues that to reach this end, the Board must look to all relevant facts which an employer would consider before entering into a collective bargaining agreement. Clearly, among these facts is the employer's economic condition.

Since its first make-whole decision, the Board has refused to examine the details and determine the probability that an employer would enter into a contract with specific terms. It felt that to do so would cause it to become too involved in the determination of the terms of a contract. The Board in *Adam Dairy* stated: "It has been the thesis of this law since the enactment of the Wagner Act in 1935 that the practice of collective bargaining should take place free of state interference with the interplay of economic forces and the substance of agreements reached between the parties.

" . . . . . . . . . . . . . . . . . .

"The basic theme of the Act was that through collective bargaining the passions, arguments, and struggles of prior years would be channeled into constructive, open discussions leading, hopefully, to mutual agreement. But it was recognized from the beginning that agreement might in some cases be impossible, and it was never intended that the Government would in such

cases step in, become a party to the negotiations and impose its own views of a desirable settlement. *H.K. Porter Co.* v. *NLRB,* 397 U.S. 99 (1970)."

The Board went on to note that the ALRA, like the NLRA, prohibits the Board from ordering a party to enter into a contract. However, under the ALRA, this prohibition must be read with an awareness that the ALRA permits the Board to order make whole in appropriate refusal to bargain cases.

Recognizing this difference, the Board in the *Adam Dairy* case concluded that it had the duty to fashion a make-whole remedy "which is minimally intrusive into the bargaining process and which encourages the resumption of that process." (*Adam Dairy, supra,* at p. 11.) The Board was concerned that because the "wealth of available data will give rise to extensive and detailed offers and counter-offers of proof, and will result in protracted litigation at the compliance stages . . . [i]t is entirely appropriate . . . to balance the need for reasonable certainty in the amount of damages with the need to minimize delays in bargaining which result directly from use of the Board's processes." (*Id.,* at p. 12.) To reach this goal in the case before it, the Board utilized all contracts entered into by the UFW and employers existent at that time and found the average wage expressed in those contracts to be the amount the employees of *Adam Dairy* would have received had their employer bargained in good faith. As indicated above, the Board in the years since it decided *Adam Dairy* has utilized any number of contracts which it determined to have been entered by employers in positions comparable to the employer which is before the Board. In each case, the Board attempted to determine a wage rate the employees may have received had the employer not refused to bargain. Repeatedly, the Board has refused to become a part of the negotiations. It has rejected evidence as to why an employer would not have agreed to this or that term as part of a contract. (See e.g., *Kyutoku Nursery, Inc., supra,* 8 ALRB No. 73; *Robert H. Hickam, supra,* 9 ALRB No. 6.)

If the ALRB was to attempt to determine the amount needed to compensate employees for a refusal to bargain by their employer by looking to the company's profits and losses, its costs and expenses and the necessity or desirability of each, it would find itself in direct center stage of negotiations. It is well settled that this is the job of negotiators and any resolution of disputes or disagreements in this area must be resolved through economic forces and the give and take of negotiations, unless it is determined that the free enterprise system enjoyed by the United States must be discarded in favor of specifics determined appropriate by the government.

The employer seeks to bolster its position on this issue by arguing that failure of the Board to permit it to introduce evidence of its economic conditions and basing an award upon what employees earned under another UFW contract creates an irrebuttable presumption that its employees would have earned more had it bargained with the UFW. Creation of such an irrebuttable presumption denies it due process of law.

This argument is faulty. The record reflects that the Board began with a blank sheet of paper. It accepted into evidence all contracts entered into by companies possibly comparable to petitioner. In the end, it concluded that the Sun Harvest contract most accurately represented wages the employees of Holtville Farms would have earned had the company bargained with the union. It did not start out with the Sun Harvest contract, presume it to be the comparable contract and permit no evidence to rebut this presumption.

*Failure of the Board to Find That a Contract Would Have Been Entered Into Had the Employer Bargained in Good Faith*

Petitioner argues that before a make-whole remedy can be ordered, the Board must first conclude that a contract would have been entered into had the employer negotiated in good faith. In *Holtville Farms, Inc.* (1981) 7 ALRB 15 (petn. rev. den. and petn. hg. den.), the Board ordered that make whole be awarded to the employees of Holtville Farms. Review of that order is not, and cannot be, again before this court. The issue before the court at this time is review of the amount necessary to make the employees whole, not whether or not they should be made whole. For this reason, it is now irrelevant whether a make-whole order is appropriate here, or inappropriate because the Board did not have proof that Holtville Farms would have entered into a contract with the UFW had it not unlawfully refused to bargain with the union.

The petition for review is summarily denied.

Brown (Gerald), P. J., and Butler, J., concurred.

Petitioner's application for review by the Supreme Court was denied July 11, 1985.