Filed 5/14/15  San Joaquin Tomato Growers v. Agric. Labor Rel. Bd. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| SAN JOAQUIN TOMATO GROWERS, INC., <br><br> Petitioner, <br><br> v. <br><br> AGRICULTURAL LABOR RELATIONS BOARD, <br><br> Respondent; <br><br> UNITED FARM WORKERS OF AMERICA, <br><br> Real Party in Interest. | F068406 <br><br> (ALRB Decisions 38 ALRB No. 4, 38 ALRB No. 12, 39 ALRB No. 14, 39 ALRB No. 15) <br><br> **OPINION** |

ORIGINAL PROCEEDING; petition for writ of review.

Littler Mendelson, Spencer H. Hipp and George J. Tichy II for Petitioner.

J. Antonio Barbosa, Paul M. Starkey and Laura F. Heyck for Respondent.

Mario Martinez and Edgar Aguilasocho for Real Party in Interest.

-ooOoo-

Petitioner, San Joaquin Tomato Growers, Inc. (San Joaquin), failed to bargain in good faith with real party in interest, United Farm Workers of America (UFW), following certification of the UFW's representation of San Joaquin's agricultural employees. Thereafter, the Agricultural Labor Relations Board (ALRB) ordered San Joaquin to make its employees whole for the loss of pay resulting from San Joaquin's refusal to bargain. Approximately 20 years later, the ALRB set the "make-whole" amount at $231,875 plus interest that will be collected as each employee is located. (*San Joaquin Tomato Growers, Inc.* (2013) 39 ALRB No. 14.)

San Joaquin challenges this award on the grounds that the ALRB's methodology and resulting decisions are not supported by substantial evidence and are unreliable. San Joaquin further contends the ALRB erred in ordering any unclaimed principal to be paid to the Agricultural Employee Relief Fund because that fund did not exist at the time San Joaquin was first ordered to make the employees whole.

However, there is a plausible basis for the ALRB's findings. Therefore, under the highly deferential standard of review applicable to ALRB decisions, we will affirm.

## BACKGROUND

San Joaquin contracts with growers to grow and harvest fresh market round green tomatoes on the growers' properties. San Joaquin and the growers coordinate the harvest and San Joaquin packs and markets the tomatoes. San Joaquin employs a labor contractor to provide the agricultural employees who harvest the tomatoes. The harvest begins in late June to early July and concludes in approximately late October to early November of each year.

In August 1989, the San Joaquin agricultural employees voted in favor of UFW representation. San Joaquin filed objections to the election and an evidentiary hearing was held in August 1991. Following the investigating hearing examiner's decision in August 1992, the UFW was certified as the collective bargaining representative of all San Joaquin agricultural employees on May 3, 1993.

2.

By letter dated June 14, 1993, the UFW requested negotiations with San Joaquin. On July 12, 1993, San Joaquin informed the UFW that it was declining the bargaining request in order to obtain judicial review of the certification.

In August 1994, the ALRB found that San Joaquin's "technical" refusal to bargain was conducted in bad faith. The ALRB ordered San Joaquin to bargain collectively and in good faith with the UFW and to "[m]ake whole its agricultural employees for all losses of pay and other economic losses they have suffered as a result of [San Joaquin's] failure and refusal to bargain in good faith …." (*San Joaquin Tomato Growers, Inc.* (1994) 20 ALRB No. 13, pp. 19-20.)

San Joaquin began negotiating with the UFW on September 8, 1994. Accordingly, the period of time covered by the make-whole award is July 12, 1993 through September 8, 1994. (*San Joaquin Tomato Growers, Inc.* (2012) 38 ALRB No. 4.)

In July 1995, the case was released for compliance and the ALRB's Visalia Regional Office (Regional Office) began compliance efforts. San Joaquin was asked to provide payroll records but did not do so. Rather, San Joaquin took the position that no make-whole was due because during the period in question San Joaquin "'paid tomato pickers $0.475 per bucket, which was the highest rate paid for the harvest of fresh tomatoes 'anywhere in the world.'" (*San Joaquin Tomato Growers, supra,* 38 ALRB No. 4, pp. 2-3.) Eventually, in December 1996, San Joaquin provided the Regional Office with payroll check stubs for six workers showing the $0.475 per bucket rate. During this period, the Regional Office also asked the UFW to provide its position. However, the UFW did not respond to these requests. (*San Joaquin Tomato Growers, supra,* 38 ALRB No. 4, p. 3.)

San Joaquin and the UFW negotiated during this period and by August 1998 had agreed to a series of proposals and appeared to have reached a collective bargaining agreement. However, the contract was never prepared and signed. In 2012, the ALRB

concluded that the agreement was nonbinding and directed the parties to mandatory mediation and conciliation. (*San Joaquin Tomato Growers, Inc.* (2012) 38 ALRB No. 2.)

In April 2001, the case was transferred to the ALRB's General Counsel Headquarters in Sacramento. In May 2002, counsel prepared a memo recommending that a contract averaging method be used to calculate the make-whole amount when no comparable contracts are available. Counsel's memo was accompanied by a report from Dr. Philip Martin, a professor of agricultural economics at U.C. Davis, which included a survey of 22 UFW contracts in effect between 1992 and 1994. (*San Joaquin Tomato Growers, supra,* 38 ALRB No. 4, pp. 3-4.)

The Regional Office evaluated the 2002 memo and report and concluded that payroll data was required to complete the recommended calculations. When the Regional Office again asked San Joaquin to provide payroll records, San Joaquin responded that it did not have them. In November 2005, the Regional Office informed the ALRB that it lacked the necessary payroll data. Several years later, in May 2009, the Regional Office filed a motion requesting the ALRB to close the case without full compliance. (*San Joaquin Tomato Growers, supra,* 38 ALRB No. 4, p. 4.) The ALRB granted this motion to close in February 2010 based on the unavailability of crucial records.

The UFW filed a request for reconsideration. The ALRB denied the UFW's request but granted reconsideration on other grounds sua sponte and the case was reopened. In June 2010, the UFW announced that it had located the relevant San Joaquin payroll records.[1]

---

[1] San Joaquin's request that this court take judicial notice of an excerpt from the opening brief filed by the UFW in the Third Appellate District in *United Farm Workers of America v. Agricultural Labor Relations Board*, case No. C075210, is denied. The UFW's unsubstantiated statement that it provided San Joaquin's payroll records to the Regional Office in the mid-1990's is not relevant to the issues on appeal here.

The General Counsel issued a make-whole specification in April 2011. Using the contract averaging approach outlined by Dr. Martin, the Regional Office calculated an average wage increase of 4.3 percent, plus a 5 percent increase for holidays, vacation and miscellaneous benefits, and an increase of 10.5 to 17.7 percent for medical insurance and pension contributions for a total of $347,170 in principal plus interest for 700 workers. (*San Joaquin Tomato Growers, supra,* 38 ALRB No. 4, p. 5.) San Joaquin contested the amount of the make-whole. Therefore, the matter proceeded to a compliance hearing before an administrative law judge (ALJ) in July and August 2011.

The ALJ issued his recommended decision in January 2012. The ALJ concluded that General Counsel's methodology, i.e., averaging the 21 or 22 statewide contracts in effect during the make-whole period, was unreasonable. The ALJ noted several problems with the agreements used for comparison. For example, the contracts did not cover employees working in San Joaquin's industry or performing the same type of job duties, the contracts appeared to relate to longstanding collective bargaining relationships as opposed to initial contract negotiations, and the farming operations were in different geographic areas.

The ALJ also rejected San Joaquin's contention that it was appropriate to base the make-whole on its 1998 agreement with the UFW. The ALJ reasoned that the agreement was preceded by San Joaquin's unlawful refusal to bargain, was reached far outside the bargaining make-whole period, and was unexecuted.

However, the ALJ accepted San Joaquin's position that the UFW's collective bargaining agreements with Meyer Tomatoes, introduced into evidence by San Joaquin, constituted comparable contracts. There were two available, a 1995 agreement with Meyer Tomatoes in Visalia and a 1995 agreement with Meyer Tomatoes in Salinas/King City. The Visalia agreement was an initial agreement while the Salinas/King City agreement was a successor agreement.

The ALJ concluded that the Meyer Tomatoes Visalia agreement was a comparable contract upon which to base the make-whole amount. Although it went into effect 11 months after the make-whole period, the Meyer Tomatoes Visalia agreement covered employees in the same industry with the same job classification and similar wage rates. Further, although the Meyer office was approximately 150 miles away from Visalia, both were in the California Central Valley. The ALJ rejected the Meyer Tomatoes Salinas/King City agreement as being comparable because it arose from a longstanding collective bargaining relationship and the operation was located in California's coastal region.

Regarding the amount of the make-whole, the ALJ adopted the year-by-year breakdown of the statewide wage increases calculated by San Joaquin's expert. The ALJ ordered San Joaquin to pay 2.5 percent of the employees' gross wages for the period of July 12, 1993 to July 11, 1994, and 5.4 percent for the period of July 12, 1994 to September 8, 1994, plus interest. The ALJ included no award for fringe benefits. The ALJ cut off interest at the end of the second quarter in 1997 based on the ALRB's delay and mixed signals regarding its intentions to proceed. Both General Counsel and the UFW filed exceptions to the ALJ's decision.

The ALRB upheld the ALJ's rejection of the 1998 agreement between the parties as an appropriate comparable contract for the purpose of calculating make-whole. However, the ALRB rejected the ALJ's use of the 1995 Meyer Tomatoes Visalia agreement as a comparable contract. The ALRB reversed the ALJ's conclusion that the contract averaging methodology was unreasonable on its face and applied it with certain modifications. The ALRB eliminated a 5 percent increase for miscellaneous fringe benefits, added five contracts that had not been included in the initial calculation, and modified the application of the methodology.

Following various decisions, remands and revisions, the ALRB ultimately ordered San Joaquin to pay bargaining make-whole to the employees as follows: wage increases

6.

of 2.52 percent for 1993 and a compounded 2.25 percent for 1994; medical and pension benefits per hour worked of $0.88 and $0.09; and a paid holiday component for July 4 and Labor Day where it could be verified that a worker worked 5 days in the two weeks preceding the holiday. Based on these components, the total principal amount of make-whole was calculated to be $231,875. The ALRB further ordered that interest was to be awarded and collected as each employee is located and that any funds unclaimed two years after collection were to be deposited in the Agricultural Employee Relief Fund.

## DISCUSSION

### 1. *Standard of review.*

Labor Code[2] section 1160.8 provides that, on review, the ALRB's findings of fact shall be conclusive "if supported by substantial evidence on the record considered as a whole." This standard of review is met if the record contains relevant evidence that a reasonable mind might accept in support of the findings. (*Carl Joseph Maggio, Inc. v. Agricultural Labor Relations Bd.* (1984) 154 Cal.App.3d 40, 54 (*Carl Joseph Maggio*).) Accordingly, the reviewing court does not reweigh the evidence. Rather, if there is a *plausible* basis for the ALRB's factual decisions, the court is not concerned that contrary findings may seem equally reasonable, or even more so. (*Rivcom Corp. v. Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743, 756-757.)

This highly deferential standard of review is required because the ALRB's findings "'carry the authority of an expertness which courts do not possess and therefore must respect.'" (*Tex-Cal Land Management, Inc. v. Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 346.) "The insights gained through the [ALRB's] special expertise entitle its decisions to special deference." (*Cardinal Distributing Co. v. Agricultural Labor Relations Bd.* (1984) 159 Cal.App.3d 758, 766.) Nevertheless, this limited scope of review does not require the reviewing court to abdicate its responsibility to the extent

---

**2** All further statutory references are to the Labor Code.

of merely "'rubber-stamping'" its affirmance of the ALRB's decision when, after full review of the record, the court is unable to conscientiously conclude that the evidence supporting such decision is substantial. (*Carl Joseph Maggio, supra,* 154 Cal.App.3d at p. 55.)

## 2. *The make-whole remedy.*

Section 1160.3 gives the ALRB the authority to order an employer to make employees whole for loss resulting from the employer's refusal to bargain. (*Holtville Farms, Inc. v. Agricultural Labor Relations Bd.* (1985) 168 Cal.App.3d 388, 390 (*Holtville Farms*).) "The remedy is designed to give agricultural employees the type of economic benefits they would have received if the parties had reached a timely agreement." (*George Arakelian Farms, Inc. v. Agricultural Labor Relations Bd.* (1989) 49 Cal.3d 1279, 1286, fn. 3 (*Arakelian Farms*).)

The ALRB has broad discretion in applying this remedial make-whole power. (*Holtville Farms, supra,* 168 Cal.App.3d at p. 390.) "'Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the [ALRB's] discretion and must guard against the dangers of sliding unconsciously from the narrow confines of law into the more spacious domains of policy.'" (*Carian v. Agricultural Labor Relations Bd.* (1984) 36 Cal.3d 654, 674 (*Carian*).) Accordingly, the ALRB's remedial order should not be disturbed "'unless it can be shown that the order is a patent attempt to achieve ends other than those which can be fairly said to effectuate the policies of the Act.'" (*Ibid.*)

To determine what the employees would have received had the employer not refused to bargain, the ALRB may adopt various formulas reasonably designed to produce close approximations. (*Holtville Farms, supra,* 168 Cal.App.3d at p. 391.) There may be several equally valid methods of computation, each yielding a somewhat different result. However, the fact that the ALRB chooses to proceed by one method instead of another can hardly be said to make out a case of abuse of discretion. (*Ibid.*)

8.

Rather, differing circumstances lead to differing measures of damages. Moreover, because of its expertise and specialized knowledge, the ALRB's decisions are vested with a presumption of validity. (*Arakelian Farms, supra,* 49 Cal.3d at p. 1292.)

In an early case, *Adam Dairy* (1978) 4 ALRB No. 24, the ALRB used the state-wide average of all UFW contracts then in existence to calculate the make-whole amount. Since *Adam Dairy*, the ALRB's make-whole calculations have included using one comparable contract (*Kyutoku Nursery, Inc.* (1982) 8 ALRB No. 73), a group of 10 comparable contracts (*Robert H. Hickam* (1983) 9 ALRB No. 6), and a group of 8 comparable contracts (*Kawano, Inc.* (1984) 10 ALRB No. 17). (*Holtville Farms, supra,* 168 Cal.App.3d at pp. 391-392.) Again, in 1990, when no comparable contracts existed, the ALRB followed the *Adam Dairy* approach and used average wages paid for specific jobs in the industry under negotiated agreements. (*Abatti Farms, Inc.* (1990) 16 ALRB No. 17.) Thus, the ALRB's make-whole approach has varied from using an average of the wage rate in all UFW contracts to using one comparable contract.

**3.      *Under the highly deferential standard of review, the ALRB's decisions stand.***

***a. The ALRB did not abuse its discretion in rejecting San Joaquin's claim that no make-whole is due.***

From the beginning of this proceeding, San Joaquin has argued that it was paying the highest piece rate for the harvest of fresh market round green tomatoes and therefore does not owe any make-whole. According to San Joaquin, Regional Office staff recognized that San Joaquin paid top wages during the make-whole period and concluded that the award of additional monetary relief was unwarranted. San Joaquin asserts the ALRB completely ignored this unrefuted fact.

Contrary to San Joaquin's position, the ALRB did not ignore this claim but, rather, considered and rejected it. The ALRB noted that San Joaquin's contention that it paid the highest rate was neither proven nor disproven. The ALRB further concluded that, in any event, "effective collective bargaining may have achieved not only higher wages, but also

9.

benefits such as health insurance and pension contributions. While a makewhole specification must be a reasonable measure of what good faith bargaining would have achieved, [San Joaquin's] claim is not a supportable stopping point in estimating the amounts owing in this case." (*San Joaquin Tomato Growers, supra,* 38 ALRB No. 4, p. 14.)

Moreover, the Regional Office staff's preliminary determination that no make-whole was due is of no moment. The ALRB is the ultimate factfinder. (*Andrews v. Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781, 794.) The appellate court must start with the fact finding made by the ALRB and accept it if it is supported by substantial evidence. (*Royal Packing Co. v. Agricultural Labor Relations Bd.* (1980) 101 Cal.App.3d 826, 835.)

Deferring to the ALRB's expertise, we conclude it did not abuse its discretion when it rejected San Joaquin's claim that no make-whole was due.

### b. The ALRB did not abuse its discretion in rejecting the 1998 agreement as a fair measure of make-whole.

As discussed above, after approximately four years of good faith bargaining, San Joaquin and the UFW reached an agreement. However, a contract was never signed and, in 2012, the agreement was ruled to be nonbinding.

San Joaquin argues this 1998 agreement is the fairest measure of make-whole. According to San Joaquin, the agreed upon terms provide the most accurate statement of what the parties would have agreed to during the make-whole period.

San Joaquin's position was rejected by both the ALJ and the ALRB. The ALRB concluded the agreement was not comparable because it was preceded by San Joaquin's unlawful refusal to bargain, was four years outside the make-whole period, and was unexecuted and nonbinding.

In *J.R. Norton* (1984) 10 ALRB No. 42, the ALRB held that reliance on a subsequently negotiated contract is inappropriate and unreasonable. The ALRB

10.

concluded that such a contract was a questionable measure due to the likelihood of the union suffering a significant loss of support due to the lapse of time between the union's certification and the commencement of good faith bargaining. Further, economic conditions as well as any number of other factors could have changed. (*J.R. Norton, supra,* 10 ALRB No. 42, pp. 14-15.)

San Joaquin asserts that any weakening of the UFW's bargaining position was due to the almost four year delay between the election and the UFW's certification. However, San Joaquin contested the election and thus was partially responsible for this delay. Nevertheless, San Joaquin caused an additional delay between the certification and the commencement of good faith bargaining that could have either weakened or further weakened the UFW's bargaining position. More importantly, the agreement was reached four years after the make-whole period and thus did not reflect the conditions that existed when San Joaquin refused to bargain. Under these circumstances, the ALRB did not abuse its discretion in rejecting the 1998 agreement as a comparable contract.

*c. The ALRB did not abuse its discretion in rejecting the Meyer Tomatoes agreement as a comparable contract.*

San Joaquin argues that the two 1995 Meyer Tomatoes contracts were the most comparable contracts and therefore the ALRB erred in rejecting them. San Joaquin notes that these contracts covered the same crop and at least one of them, the Visalia agreement, was in the same geographic area, i.e., the Central Valley. Further, these contracts were signed only 10 months after San Joaquin started bargaining with the UFW. As discussed above, the ALJ used the Visalia agreement as a comparable contract because it concerned the same crop in a geographically similar location and was a first term bargaining agreement.

The ALRB rejected the ALJ's use of the 1995 Meyer Tomatoes Visalia contract for two reasons. First, Dr. Martin, an expert on agricultural and resource economics, testified that Visalia wages and Monterey County wages were generally lower than the

11.

geographical area where San Joaquin operates. The ALRB concluded that the ALJ should not have discounted Dr. Martin's testimony because this information was within his area of expertise.

Further, the Meyer contract was executed after the employer was found to have engaged in unlawful surface bargaining. Surface bargaining "is defined as '"going through the motions of negotiating," without any real intent to reach an agreement.'" (*William Dal Porto & Sons, Inc. v. Agricultural Labor Relations Bd.* (1984) 163 Cal.App.3d 541, 549.) The ALRB opined that surface bargaining undermines a union's bargaining position as much, if not more, than an outright refusal to bargain.

Additionally, Dr. Martin testified that Meyer Tomatoes was in the process of going out of business in the United States and moving its operation to Mexico. Also, the Meyer Tomatoes contracts were outside the make-whole period.

Again, we must defer to the ALRB's expertise and presume its decision is valid. There being a plausible basis for the ALRB's determination that the Meyer Tomatoes contracts were not appropriate comparable contracts, we will uphold that finding as being supported by substantial evidence. Accordingly, the ALRB did not abuse its discretion when it rejected the Meyer Tomatoes contracts as a measure of the make-whole calculation.

### d. The ALRB acted within its discretion when it used a contract averaging approach.

Having concluded there were no comparable contracts available, the ALRB used a contract averaging method to calculate the make-whole amount. Using data from 24 UFW contracts in effect during the make-whole period, the ALRB measured the average increase in wages (hereafter "contract averaging.") The ALRB concluded the use of this average increase measure significantly mitigated concern over the contracts not being comparable.

Regarding the fringe benefits, the ALRB found the concern over whether the contracts were "mature" rather than first contracts was overstated. The ALRB reasoned, "In situations where benefits were not provided prior to the first contract, the initial economic value of those benefits would tend to be greater than the incremental increase in benefits in successive contracts. Therefore, while the averaging of benefits from the sampling of contracts is not a perfect measure, we find it to be reasonable in these circumstances." (*San Joaquin Tomato Growers, supra,* 38 ALRB No. 4, p. 17.)

San Joaquin objects to the ALRB's use of contract averaging to determine the make-whole amount. According to San Joaquin, this unprecedented method is unreliable and resulted in a punitive award. San Joaquin notes that the contracts used were supposed to represent a reasonable sampling of UFW contracts but that no one knew the total number of UFW contracts in effect during the make-whole period. Rather, San Joaquin argues, the only reasonable make-whole method is to use comparable contracts.

Although San Joaquin would prefer the use of comparable contracts to determine the make-whole amount, the ALRB determined that no such contracts existed. As discussed above, this finding is supported by substantial evidence.

Contrary to San Joaquin's position, the contract averaging method is not unprecedented. This approach has been used by the ALRB since 1978. (*Holtville Farms, supra,* 168 Cal.App.3d at pp. 391-392.) Further, the ALRB has broad discretion in applying its remedial make-whole power and does not abuse its discretion by choosing one method over another. (*Id.* p. 390.)

San Joaquin's claim that the contract averaging used here is unreliable is also unpersuasive. According to San Joaquin, the ALRB would have had to use the "universe of collective bargaining agreements" in effect during the make-whole period before the result could be found reliable. However, the ALRB used what it considered to be a representative sample of contracts, including several it added to Dr. Martin's report. Because of the ALRB's expertise and specialized knowledge, its decisions are vested

with a presumption of validity.  (*Arakelian Farms, supra,* 49 Cal.3d at p. 1292.)  As a reviewing court, we must not enter the area of the ALRB's discretion.  Rather, this remedy is peculiarly a matter for administrative competence.  (*Carian, supra,* 36 Cal.3d at p. 674.)

 San Joaquin's claim that the use of mature as opposed to first time contracts resulted in the improper inclusion of medical and pension benefits is also unconvincing. The ALRB considered this argument and concluded that the averaging of benefits from the sampling, while not perfect, was a reasonable measure.  We must defer to the ALRB's expertise and presume its decision is valid.

There being a plausible basis for the ALRB's contract averaging calculation, we will uphold the ALRB's determination of the make-whole amount as being supported by substantial evidence.

### e. The interest award was reasonable.

The ALRB awarded interest on the make-whole amount for the entire period of the enforcement delay.  However, based on the "unique" history of the case, i.e., "a complex amalgam of agency inaction, employer recalcitrance and union indifference," the ALRB ordered the award of interest to be contingent upon the employees being located.  (*San Joaquin Tomatoes, supra,* 38 ALRB No. 4, p. 21.)

San Joaquin acknowledges that this was "a thoughtful response to 'unique circumstances.'"  Nevertheless, San Joaquin argues that, as found by the ALJ, it is grossly unjust to impose interest beyond the second quarter of 1997 because of the ALRB's delay and mixed signals.

However, as found by the ALRB, the agency, employer and union shared responsibility for the delay.  Further, the ALRB is not required to place the consequences of its own delay, even if inordinate, upon wronged employees to the benefit of wrongdoing employers.  (Cf. *NLRB v. J.H. Rutter-Rex Mfg. Co.* (1969) 396 U.S. 258, 264-265.)  This principle applies to the interest payments on monetary remedies.

14.

(*Yorkaire, Inc.* (1999) 328 NLRB No. 38.)  Accordingly, the ALRB did not abuse its discretion in making the interest award.

 ***f. The ALRB did not err in ordering any unclaimed make-whole to be deposited into the Agricultural Employee Relief Fund.***

Under section 1161, any monetary relief ordered by the ALRB to be paid by an employer to an employee is collected by the ALRB on behalf of the employee.  If the ALRB is unable to locate an employee for two years after the money is collected, the ALRB deposits that money into the Agricultural Employee Relief Fund.  This fund is used to pay employees any unpaid balance when it is not possible to collect from the employer.

The ALRB ordered that any principal amounts remaining by virtue of the employees not being located within two years be deposited in the Agricultural Employee Relief Fund as required by section 1161.  San Joaquin argues that, because it was ordered to pay make-whole in 1994 and the Agricultural Employee Relief Fund was not created until 2002, this order violates due process.  In other words, in making this order, the ALRB retroactively imposed a new remedial obligation.

San Joaquin relies on *Aktar v. Anderson* (1997) 58 Cal.App.4th 1166 to support its position.  In *Aktar*, the court held that a federal law directing the California Department of Social Services to recoup food stamps that were over issued due to administrative error would not be applied retroactively.  The court reasoned that the effect of applying the new law to preexisting administrative error would be to increase recipients' liability for past benefits and thus substantially change the legal effect of past events.  (*Id.* at p. 1182.)

Contrary to San Joaquin's position, the same principle does not apply here.  The operation of the Agricultural Employee Relief Fund does not change San Joaquin's remedial obligations in any way.  Both before and after the creation of the fund, San Joaquin's obligation was simply to pay the ALRB the relief ordered on behalf of the employees.

Further, the fact that the Agricultural Employee Relief Fund legislation took effect in 2002 is irrelevant. Money is deposited into the fund only if the ALRB is unable to locate the employee or the employee's representative two years after the money is collected from the employer. So far, no money has been collected from San Joaquin. Moreover, although San Joaquin was ordered to make its employees whole in 1994, the amount to be collected was not determined until 2012. Accordingly, the ALRB did not err in ordering any uncollected make-whole to be deposited into the Agricultural Employee Relief Fund.

## DISPOSITION

The ALRB's decisions are affirmed. Costs on review are awarded to respondent.

_____
                                                              LEVY, J.

WE CONCUR:


_____
HILL, P.J.


_____
KANE, J.